THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
GEORGINO BORRERO, Appellant.

First Department, July 24, 1986

## APPEARANCES OF COUNSEL

*Freda S. Nisnewitz* of counsel *(Rappaport & Frost,* attorneys), for appellant.

*Albert Ceva* of counsel *(Roger L. Stavis* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

MILONAS, J.

This case involves an incident which occurred in The Bronx on May 8, 1982 and resulted in the shooting death of John Johnson, a retired police officer. Defendant herein was indicated for manslaughter in the second degree and, following a nonjury trial, was convicted of criminally negligent homicide as a lesser included offense. On appeal, defendant urges that the People failed to meet their burden of disproving beyond a reasonable doubt that he was justified in firing his gun at Johnson. Moreover, he contends that there was no reasonable view of the evidence which would support a finding that he acted with sufficient recklessness or negligence to be convicted of criminally negligent homicide. Since both arguments are meritorious, defendant is entitled to a reversal of his conviction and dismissal of the indictment against him.

On the date in question, defendant herein, who was licensed to carry a handgun and had extensive training in its use, was working as a security guard in a drugstore located at 1500 Metropolitan Avenue. When Johnson entered the store at approximately 4:30 P.M. with a brown paper bag in his hand, he was requested to check his package. He did so but then inquired about a claim ticket. Defendant replied that although he did not have any tickets, Johnson's parcel was the only one being held so there would be no difficulty in retrieving it. Johnson thereupon exploded, declaring, "Give me the fucking bag. I'm not going to shop in this store anymore." Defendant returned the bag to Johnson who, still dissatisfied, stated "I

ought to punch you in the mouth". Defendant stepped back and took out his nightstick, holding it in a defensive position with both hands at waist level.

At that point Johnson pulled out a gun and told defendant to put the stick away, asserting, "You're not fucking with no kid." Defendant complied. Johnson subsequently threatened to kill defendant if the latter made another sound. Valente Silva, one of the employees of the store, then interceded and endeavored to calm Johnson. He succeeded in getting Johnson to leave the premises. This incident was also witnessed by Ely Krellenstein, the owner of the business, and Jennine Catania, another employee. After Johnson's departure, defendant attempted to follow him but was initially delayed by the pleas of those inside. However, defendant explained that it was his duty to find a policeman (he had recently seen one pass by) and notify him that there was a man with a gun walking the streets. He also apparently did not want Johnson to disappear before the police arrived. Defendant did not believe that his leaving the store would provoke any further confrontation or lead to the use of firearms. Krellenstein contacted the police and activated the silent alarm system.

Once outside, defendant, failing to see a police officer, looked in the direction in which Johnson had gone and called out loudly to him, "Hold it, are you a police officer?" Johnson did not respond to the question, but instead turned and headed back to defendant, drawing his gun from his waistband. Defendant told him to "Freeze". Johnson ignored the directive and continued approaching defendant. Defendant, crouching for protection behind a car situated near the drugstore, drew his own gun and again yelled "Freeze". Johnson, however, kept coming toward defendant. When Johnson was some 4 to 5 feet from defendant, he went into a combat stance and aimed his weapon at defendant's head. Defendant fired his own gun once, hitting Johnson in the head. He observed Johnson fall, then went over to the body and picked up Johnson's gun by inserting a pen through its muzzle. He placed the gun on the hood of the vehicle behind which he had taken cover.

The street altercation was witnessed by a number of people. Michael Lyden, a former legislative aide to a State Assemblyman and now assistant director of Neighborhood Emergency Telephone Systems, Inc., testified that defendant was empty handed when he emerged from the store and only reached for his gun after Johnson was at the opposite side of the car from

him. He heard defendant ask the other man if he was a police officer and order him to stop. Johnson did not respond. Roy Grundmann also heard defendant ask Johnson if he was a cop. According to Grundmann, Johnson was waving his gun around and did not react to defendant's question. Frank Rios, a correction officer, was sitting in his automobile across the street from the drugstore when he heard someone shout. He glanced up and saw a man walking toward the store. That person held a gun in his hand which was aimed at the front of the store. After Johnson was shot, Rios ran over, identified himself and offered to secure the scene while defendant summoned an ambulance. He noticed the gun lying on the hood of the car but did not see any holster.

Police Officer Israel Larracuente was about 1½ blocks away from the drugstore when he was informed by a pedestrian that an officer required assistance. He was heading toward the store when he heard a shot. Upon arriving at the scene, he saw a black male lying face up with a wound in his left temple. On the trunk of a nearby car there was a holstered gun loaded with five rounds of ammunition, a pipe and some bloodstains. Officer Larracuente also asserted that some minutes prior to the incident, he had passed by the drugstore and exchanged waves of the hand with defendant.

At the end of the People's case, the parties entered into several stipulations. First, it was agreed that if the ballistics expert were to testify, he would state that defendant's gun was operable and that one shell had been discharged. He would also state that the gun recovered from Johnson was operable but showed no evidence of discharge. Second, it was stipulated that if a witness from the Department of Licensing were called, he would testify that John Johnson was a retired New York City police officer with a permit to carry a weapon within city limits. Third, on the basis of testimony before the Grand Jury, if one David Rivera were called to the stand, he would say that while he was crossing the street on the day of the shooting, he heard a man dressed in blue calling to another man to identify himself and asking whether he was a police officer. Without replying, the second man pulled out a gun and began to walk toward defendant, who also had his gun out. The former then leaned over a car and aimed his unholstered pistol at the man in blue, who knelt down and fired one shot. Finally, it was agreed that an autopsy performed upon Johnson's body showed the cause of death to be a gunshot wound to the head. A supplementary toxicology re-

port indicated the presence of .07% ethyl alcohol in Johnson's brain.

Defendant moved to dismiss the indictment following the admissions of the stipulations. The trial court denied the motion, and the defense introduced its case. After both sides had rested and concluded their summations, the court, acting as the trier of the facts, found that all of the testimony, including that of defendant, was credible. However, the Judge determined that defendant had drawn his gun as soon as he left the store. Thus, while Johnson was the initial aggressor, he had effectively withdrawn from the encounter. When defendant left the store to go after Johnson, he, therefore, initiated the second confrontation and could not now claim self-defense. Since defendant had created a grave risk of death to Johnson, he was guilty of criminally negligent homicide, the lesser included offense of manslaughter in the second degree. The court subsequently sentenced defendant to five years' probation.

It should be noted that virtually every facet of defendant's account of what transpired was corroborated by other witnesses. The proof at trial clearly reveals that Johnson entered the drugstore and began a confrontation with defendant during which he displayed a weapon and behaved in a generally menacing manner. The fact that a simple dispute over a claim check was transformed into an extremely dangerous situation can only be indicative of Johnson's instability.

Pursuant to Penal Law § 35.30, which sets forth the situations under which a person is justified in using physical force to make an arrest or to prevent an escape:

"4. A private person acting on his own account may use physical force, other than deadly physical force, upon such person when and to the extent that he reasonably believes such to be necessary to effect an arrest or to prevent the escape from custody of a person whom he reasonably believes to have committed an offense and who in fact has committed such offense; and he may use deadly physical force for such purpose when he reasonably believes such to be necessary to:

"(a) Defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force".

In the drugstore in which defendant was a security guard, Johnson drew his gun and threatened defendant with it, and he did so solely because he was not presented with a claim

ticket for his checked package. The druggist and several employees observed Johnson's menacing behavior for which he was subject to prosecution for a variety of crimes. The fact that Johnson turned out to be a retired police officer with a permit to carry a gun would not have absolved him for liability for his conduct. *(See, People v Parker,* 52 NY2d 935, *revg* on dissenting opn of Birns, J., 70 AD2d 387, 391-394.) Since it is evident that Johnson had committed an offense in his presence, defendant was entitled, purely as a private citizen and without consideration of his status as a security guard, to follow Johnson out of the drugstore and make a citizen's arrest. Certainly, the evidence is more than adequate to satisfy the mandates of Penal Law § 35.30 (4).

The record further demonstrates that defendant left the store for the specific purpose of effecting Johnson's arrest. According to defendant, he had seen a policeman pass by only a few minutes earlier (and Officer Larracuente recalled exchanging waves of the hand with defendant). Therefore, when defendant went outside, it was his intention to find the police officer or else to detain Johnson until the arrival of the police summoned by the druggist. Under Penal Law § 35.30 (4), defendant had the authority to use ordinary physical force to the extent necessary to arrest Johnson or to prevent his escape. Yet, defendant made no attempt to use force. Rather, he repeatedly called out to Johnson to stop and identify himself. Instead of responding, Johnson simply pulled out his gun and advanced upon defendant, who was still standing near the drugstore. Although defendant crouched behind a parked car for cover, Johnson kept coming at him. It was not until Johnson assumed a combat stance and took aim at defendant's head that defendant fired at Johnson.

Although section 35.30 (4) does not require that an individual who is contemplating making a valid citizen's arrest retreat in the face of imminent deadly physical force, Penal Law § 35.15 (2), which encompasses the most common "self-defense" claim, does state that:

"A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

"(a) He reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating".

Even assuming that defendant did have a duty to retreat, the People have failed to establish beyond a reasonable doubt that defendant knew that he could with complete safety retreat from a man advancing at him with a pointed gun. Further, the fact that defendant came out of the drugstore to locate a policeman clearly did not constitute an attempt to start a second confrontation. Defendant acted entirely reasonably and within statutory parameters in endeavoring to stop Johnson from possibly continuing his aggressive behavior and injuring someone. In all respects, defendant's conduct was that of a responsible citizen. Contrary to the trial court's determination, the proof overwhelmingly shows that defendant did not draw his gun as soon as he walked out of the store but did so only after Johnson's threat to his safety and/or life had become immediate and unavoidable. He did not demonstrate anger or personal animosity toward Johnson. He merely requested that Johnson identify himself and then tried to back away in the face of Johnson's hostile reaction. At any rate, under the circumstances herein, defendant's subjective belief as to the imminence and gravity of danger was clearly reasonable. *(People v Wagman,* 99 AD2d 519.)

As for defendant's second argument, there is no reasonable view of the evidence to support a finding that he was guilty of criminally negligent homicide because he acted in a reckless or negligent way. The trial court apparently concluded that defendant negligently disregarded the danger of death to Johnson. However, defendant, an armed security guard and a marksman skilled in the use of firearms, in the course of attempting to make a valid citizen's arrest of Johnson or to detain him until the police could arrive on the scene, was threatened with deadly physical force when Johnson crouched down and took aim at him. Defendant, under a reasonable apprehension that he was about to be shot, responded by aiming back at Johnson and firing a single bullet at the latter's head. He never claimed that his intention was to scare the victim rather than to kill him *(see, People v Murphy,* 88 AD2d 1000), that the gun discharged by accident, that he believed the gun to be unloaded, or that he was unfamiliar with its use. On the contrary, defendant's act was a deliberate one, and he was aware at all times of what he was doing and the precise consequences of his actions. There was thus nothing reckless, negligent or accidental in the shooting.

Defendant was originally indicted for manslaughter in the second degree in that it was alleged that he recklessly caused

the death of John Johnson. Under Penal Law § 15.05 (3), a person acts recklessly when "he is aware of and consciously disregards a substantial and unjustifiable risk" that a particular result will take place—in this instance, the death of Johnson. The lesser included offense of which defendant was convicted, criminally negligent homicide (Penal Law § 125.10) is defined as causing the death of another person with criminal negligence—that is, negligently failing to perceive the risk at all. *(People v Strong,* 37 NY2d 568.)

Since defendant was justified in following Johnson out of the drugstore in order to ensure the safety of people in the street against the peril posed by Johnson, and no evidence was introduced at trial that defendant was not completely cognizant that if he aimed and fired his gun at Johnson from a close distance, death might ensue, there is no basis for a determination that defendant was guilty of criminally negligent homicide. The fact that defendant may have failed to anticipate Johnson's violent behavior is scarcely sufficient reason to hold that defendant acted in a negligent (or reckless) manner by leaving the store. Perhaps, in hindsight, the defendant could have handled the situation differently but his conduct was certainly in no way criminal. Defendant, however, would have been remiss had he simply ignored what had occurred and gone about his business as if he had never encountered Johnson.

Therefore, the judgment of the Supreme Court, Bronx County (Peggy Bernheim, J.), rendered on July 6, 1983, which convicted defendant, following a trial without jury, of criminally negligent homicide and sentenced him to a period of probation for five years, is reversed, on the law and the facts, the conviction vacated and the indictment dismissed.

MURPHY, P. J., KUPFERMAN, SULLIVAN and CARRO, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on July 6, 1983, unanimously reversed, on the law and the facts, the conviction vacated and the indictment dismissed.