*Daniel Joseph Greene v. State of Maryland*, No. 7, September Term, 2019

**CRIMINAL LAW — CONSTITUTIONAL IDENTIFICATION LAW— NON-EYE-WITNESS IDENTIFICATION — CONFIRMATORY IDENTIFICATION**

The Court of Appeals affirmed the judgment of the Court of Special Appeals. That court held that the identification by a non-eyewitness who knew the suspect is not governed by constitutional identification law, but rather was a "confirmatory identification." Consequently, the circuit court erred as a matter of law in applying the due process analysis of *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), which governs eyewitness identifications.

IN THE COURT OF APPEALS
OF MARYLAND

No. 7

September Term, 2019

_____

DANIEL JOSEPH GREENE

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth,
Battaglia, Lynne A. (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: June 9, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

It is not unusual during a criminal investigation for the police, having focused on a suspect, to ask an eyewitness to the crime to attempt to identify the suspect. Such an identification procedure may take the form of a lineup, a photographic array, a one-person show-up, or display of a single photograph. The United States Supreme Court, recognizing that such procedures have the potential to be impermissibly suggestive and ultimately unreliable, has developed a constitutionally-based body of law governing police-initiated selection procedures to protect suspects from unfair identification procedures. *See*, *e.g.*, *Stovall v. Denno*, 388 U.S. 293 (1967), *Neil v. Biggers*, 409 U.S. 188 (1972), *Manson v. Brathwaite*, 432 U.S. 98 (1977).

Not all investigatory procedures relating to identifying a suspect, however, seek an eyewitness's selection of a person as involved in the crime under investigation. Some police procedures seek only to obtain the suspect's identity from someone who, though not an eyewitness to the crime, is familiar with the suspect. We are presented with such a situation in this case.

The identification at issue here arises from a murder investigation. Shortly after the murder, the investigating detectives focused on Daniel Joseph Greene, Petitioner, as the suspected killer. About the same time, the detectives discovered that a surveillance camera mounted on a building adjacent to the apartment where the murder occurred had captured a person attempting to enter the apartment around the time of the murder. The detectives were aware that the murder victim's current girlfriend, Jennifer McKay, knew Petitioner for years and, until recently, had been in an intimate relationship with him. The detectives interviewed Ms. McKay at the police station and asked her to review the camera footage.

She did so and determined that the person depicted on the videotape footage "looks like" Petitioner.

Petitioner was charged with having committed the murder. He filed in the Circuit Court for Baltimore City a motion to suppress the identification of him by Ms. McKay. Petitioner argued to the circuit court that the identification was obtained during "an impermissibly suggestive process," rendering the identification inadmissible at trial. The circuit court agreed and granted the suppression motion. The State noted a direct appeal of that decision.[1]

The Court of Special Appeals held that the police-initiated procedure resulting in the identification of Petitioner was not governed by constitutional criminal procedure law concerning out-of-court identifications made by an eyewitness, as the suppression court had mistakenly believed was the case. Ms. McKay's identification of Petitioner was of an altogether different sort; it was a "confirmatory identification," not subject to constitutional scrutiny. We agree and affirm the judgment of the Court of Special Appeals.

---

[1] The State is entitled, in this circumstance, to file a direct appeal of the suppression court's ruling pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c)(4)(iii) and (iv) (Rep. Vol. 2013, Supp. 2019).

# I.

## Facts and Procedural History

Sometime during the early morning hours of November 29, 2017, Jon Hickey[2] was murdered in his apartment in the Fells Point neighborhood of Baltimore City. At the time of his death, Mr. Hickey had been involved for roughly a month and a half in an intimate relationship with Ms. McKay. Before then, Ms. McKay had been in a five-year intimate relationship with Petitioner, whom she had known since elementary school. Ms. McKay last saw Petitioner in early November 2017, several weeks before Mr. Hickey was killed.

During their investigation of the murder, the detectives recovered surveillance videotape footage from at least one camera mounted on the rear of a house next to Mr. Hickey's apartment.[3] The videotape showed a person apparently attempting to enter the apartment. The detectives, believing the person in the videotape may be the murderer, asked Ms. McKay to come to the station to determine whether she could identify the person on the surveillance video. We describe that interview in more detail shortly. It is enough for now to note that on multiple occasions throughout the interview Ms. McKay told the police that the person in the video "looks like" Petitioner.

---

[2] The record contains Mr. Hickey's first name spelled as both "John" and "Jon." We follow the Court of Special Appeals and use "Jon."

[3] It is not clear from the record whether the police recovered videotape footage from one or more cameras mounted on the neighboring home.

*The suppression motion and hearing*

On December 28, 2017, Petitioner was indicted in the Circuit Court for Baltimore City on a charge of first-degree murder of Mr. Hickey. Petitioner, through counsel, filed a pre-trial omnibus motion, which included a motion to suppress Ms. McKay's out-of-court identification and expected in-court identification of Petitioner as the person depicted on the video. Petitioner argued that Ms. McKay's out-of-court identification of him was the product of impermissibly suggestive police procedures.

Approximately twenty-five minutes of the police station interview with Ms. McKay was played at the suppression hearing. The interview began with Ms. McKay informing the police that she had communicated with Petitioner via phone earlier the day of the interview (December 4, 2017) but last saw him in person a few weeks before the murder. In response to the detectives' questions, Ms. McKay described Petitioner's appearance and the cars he sometimes drove.

The detectives then showed Ms. McKay brief videotape footage captured by the surveillance camera. The quality of the video was not ideal; the images were dark and grainy, and the night vision made it difficult to interpret colors. The detectives showed Ms. McKay the video several times, slowed down the speed of the video, and produced some still images of the footage.

Ms. McKay stated, early on, that the person in the video "looks like [Petitioner]" based upon the depicted person's "build" and "beard." Ms. McKay did not speak with certainty, however. She vacillated throughout the interview, stating that the person in the surveillance video "kind of looks like [Petitioner]," "looks like him," "looks more like

4

him," and "looks more like him than doesn't look like him." The detectives pressed Ms. McKay to be more certain of her identification. During the interview, the following exchange occurred:

> DET. O'CONNOR: We know this is hard for you, you're kind of like in the middle of everything, so. It's unfortunate. And I'm sure it's probably pretty hard to look at it, who you believe to be somebody. But we are – so I'm going to be blunt with you. We aren't in the I think business.
>
> MS. MCKAY: Right.
>
> DET. O'CONNOR: It's what we can prove business.
>
> MS. MCKAY: Right.
>
> DET. O'CONNOR: And I think that – that's why I asked if you were prepared to look at this. Because it's hard. You know, two people who you obviously care about and you're in the middle of it. And it's hard to look at someone knowing what –
>
> MS. MCKAY: The end result was.
>
> DET. O'CONNOR: Yeah. So is that kind of an issue possibl[e]?
>
> MS. MCKAY: Yeah.
>
> DET. O'CONNOR: But you need to – we need to know if that's him or not. And then we can do our own follow ups from there. But –
>
> MS. MCKAY: I mean, from these pictures, yes, I would say this looks like him.
>
> DET. O'CONNOR: Okay.
>
> MS. MCKAY: Yes.
>
> DET. O'CONNOR: That's all [inaudible].
>
> MS. MCKAY: [Inaudible].
>
> DET. VAUGHN: [Inaudible] from the video?

5

MS. MCKAY:  Yeah.

DET. VAUGHN: Looking at the video.

MS. MCKAY:  Yeah.

DET. O'CONNOR:  That's one thing, we just can't have the I think or I don't know.  That is what it is right there in front of you.

MS. MCKAY:  Right.

DET. O'CONNOR:  And nobody's telling you to say one way or the other.

MS. MCKAY:  Right.

DET. O'CONNOR:  We just need to know.

MS. MCKAY:  No, it looks like him.

After showing the video, the detectives displayed several still images taken from the video for Ms. McKay to consider.  Ms. McKay pointed to one image and said: "Like here, it doesn't look like him."  She pointed to another image and said: "but here it looks like him."  When Detective Vaughn echoed Ms. McKay's comment that the latter image "looks like him," Ms. McKay responded in the affirmative, though she added that the person in the image "looks taller" than Petitioner.

The exchange among Detective O'Connor, Detective Vaughn, and Ms. McKay paused briefly while the detectives had her sign and date the still images from the video camera and collected her cell phone data.  The exchange between Detective O'Connor and Ms. McKay then resumed:

DET. O'CONNOR:  But I just want to make sure that we're for certain, that you understand what I'm saying, like this isn't in between stuff, okay?

6

MS. MCKAY: Yeah. No, I – that looks like him. I can't deny that.

Ms. McKay testified at the suppression hearing that she has known Petitioner since elementary school and was in a sexual relationship with him from 2012 through 2017. She further testified that she did not believe the detectives had done anything to encourage her to identify Petitioner. She stated that she recognized Petitioner from the surveillance video but, given their prior relationship, she was reluctant to identify him.

Petitioner sought to suppress Ms. McKay's identification of him as the person depicted on the surveillance camera's videotape and still images drawn from the videotape. Petitioner argued that the detectives had engaged in impermissibly suggestive practices during the interview. Petitioner pointed to the detectives' efforts to induce Ms. McKay to identify him without equivocation; that is, they wanted her to declare that the person detected by the video camera footage "is" Petitioner rather than merely "looks like" him. In response, the State argued that even if the detectives' behavior was suggestive, the identification was nonetheless reliable.

The circuit court, after hearing the testimony of Detective Vaughn and Ms. McKay and the arguments of counsel, granted the motion. The court suppressed both Ms. McKay's out-of-court and her potential in-court identification of Petitioner. The court seemed to conclude that the police had engaged in an impermissibly suggestive process; the court did not express a view as to the reliability of that identification. The court explained its reasoning for suppressing Ms. McKay's identification:

> [I]f the police had come in and said, here's the video, can you tell us who's in the video and she says I'm not sure, it's not very clear. I'd let it in. If the police said, okay, well, let's go get the still pictures and maybe you can see

7

it more clearly, that would be fine too.  But when they cross the line and say, now look, Daniel has a beard, that guy[] has a beard.  Daniel has a nose.  Do you see the nose?  It's the same nose.  And they lead her to make a positive identification.[4]

### *The State's appeal*

The State timely exercised its statutory entitlement to appeal the circuit court's ruling suppressing Ms. McKay's identification of Petitioner on the video and the still images taken from that video.  *See supra* note 1.  The Court of Special Appeals in a reported opinion reversed the circuit court's order granting the motion to suppress Ms. McKay's identification of Petitioner.  *State v. Greene*, 240 Md. App. 119 (2019).

The Honorable Charles E. Moylan, Jr., Senior Judge, wrote on behalf of the Court of Special Appeals.  Judge Moylan made clear at the outset that "[i]t was the police behavior during [the] interview [with Ms. McKay] that was the exclusive focus of the suppression hearing."  *Id*. at 125.  And, though the court, Petitioner's counsel, and, presumably, the State, considered the issue to be of constitutional dimension, this was "not a case involving familiar constitutional identification law at all.  Jennifer McKay was not asked to look at three separate video cam tapes and to select the one with [Petitioner] in it.  Jennifer McKay

---

[4] The circuit court, in explaining her reasoning, paraphrased the detectives' statements when she said: "Daniel has a beard, that guy has a beard. Daniel has a nose.  Do you see the nose?  It's the same nose."  The record reflects that Detective Vaughn suggested to Ms. McKay that "that build looks like him" and "[t]he beard looks like him." The record further reflects that Ms. McKay tried to get "a better look" at the nose of the person in the video.  The detectives had her examine another part of the video, which she did.  Ms. McKay then noted that the person's nose is "like pushed in more. Not as like angled like this looks.  I mean, I see it, but I don't see it.  If that makes any sense.  Like, here it doesn't look like him, but here it looks like him."  To that, Detective Vaughn replied, "[b]ut that's the same person."

was asked simply to confirm, if she could, that the man on the surveillance tape was [Petitioner]." *Id*. at 124, 125. By invoking constitutional identification law, the Court of Special Appeals noted, Petitioner was in "the wrong pew in the wrong church." *Id*. at 124 (capitalization omitted). "[W]hat really concerned [Petitioner] and defense counsel and the suppression hearing judge was a discernible effort by the police to coach" a witness whom the State would be expected to call at trial. *Id*. at 126. "Any suggestiveness . . . concerned not whom Jennifer McKay would select. There was no selective identification. It concerned how forcefully or persuasively Jennifer McKay would testify. The police wanted to prime her to be a more effective witness." *Id*. The Court of Special Appeals, having concluded that the police-initiated procedure that produced Ms. McKay's identification was not subject to review for impermissible suggestiveness that rendered the identification unreliable, reversed the ruling of the suppression court.

Petitioner thereafter sought, and this Court granted, a writ of certiorari to review the judgment of the Court of Special Appeals. Petitioner poses three questions for our consideration. He first asks:

> In a case of first impression, whether the Court of Special Appeals erred in holding that Maryland adopts the "confirmatory identification" line of out-of-state cases that exempts "non-selective" identifications from pretrial constitutional review?

Assuming constitutionally-based review is available here, Petitioner poses the second and third questions:

> Whether the Court of Special Appeals erred in reversing the Circuit Court's suppression of the identification of Petitioner, where the police procedures used to obtain the identification violate due process?

9

Whether the Court of Special Appeals erred in alternatively holding that the Circuit Court failed to examine the appropriate factors in ruling the identification as inadmissible?

For reasons that shall become clear, our answer to the first question is "no." We affirm the holding of the Court of Special Appeals that this case does *not* involve constitutionally-based identification law. Therefore, we have no need to address the remaining questions.

## II.

## Standard of Review

The State's direct appeal in this matter stems from the circuit court's ruling on Petitioner's motion to suppress evidence; we therefore apply the standards applicable to appellate review of rulings on such motions. We view the record in the light most favorable to the prevailing party, here the Petitioner. *Small v. State*, 464 Md. 68, 88 (2019). We accept the suppression court's factual findings unless they are clearly erroneous, but we review the court's legal conclusions *de novo*. *Norman v. State*, 452 Md. 373, 386 (2017).

## III.

## The Parties' Arguments

Petitioner argues that the Court of Special Appeals erred in overturning the circuit court's grant of the motion to suppress Ms. McKay's identification of him as the person depicted on the surveillance camera video and still images drawn from that video. Petitioner asserts that the police subjected Ms. McKay to impermissibly suggestive procedures as were described in *Stovall v. Denno*, 388 U.S. 293 (1967), and its progeny leading up to the constitutionally-based due process test announced in *Neil v. Biggers*, 409 U.S. 188 (1972), and applied in *Manson v. Brathwaite*, 432 U.S. 98 (1977). He contends that the

intermediate appellate court should have applied that body of constitutional identification law to the actions by the police that led to the identification at issue here. According to Petitioner, had the Court of Special Appeals applied that analytical framework, that court would have concluded, as the suppression court did, that Petitioner was entitled to suppression of Ms. McKay's out-of-court identification as well as any potential in-court identification of him as the person depicted on the surveillance camera footage.

Petitioner also takes issue with what he characterizes as the intermediate appellate court's unwarranted creation of a "new" confirmatory identification "exception" to the constitutionally-based identification law paradigm. He contends that the Court of Special Appeals "erred because although it was not a selective identification in the traditional sense it was not a 'confirmatory identification' either." He maintains that, at the time the detectives interviewed Ms. McKay, they "were not confirming they had arrested the right person;" instead they merely had a "hunch" that Petitioner had committed the murder of Mr. Hickey.[5]

The State counters that the Court of Special Appeals correctly viewed Ms. McKay's identification of Petitioner as outside the realm of constitutional identification law. The State directs us to *Biggers* and *Manson*. Those two cases make clear the type of police-initiated identification procedures subject to constitutional protection and, in the State's

---

[5] Petitioner did not seek suppression of Ms. McKay's selection of him in a blind, sequential photo array procedure that also occurred while Ms. McKay was at the police station. A "blind" photo array procedure is one in which the person conducting the identification procedure does not know the suspect's identity. *See* Maryland Code, Public Safety Article, § 3-506.1(Repl. Vol. 2014).

11

view, those cases make equally clear that identifications of the sort we have here do not come within the protection of the due process construct.

The two-step test developed in *Biggers* and applied five years later in *Manson* rests upon such an analysis. *See Manson*, 432 U.S. at 99; *Biggers*, 409 U.S. at 196. That analysis seeks to prevent an eyewitness from misidentifying a person whom the police suspect has committed a crime.

In that context, the suspect's entitlement to due process is violated if the police in some fashion "slip[] the answer" to the eyewitness or otherwise "play[] with 'a marked deck'" to influence the witness's selection of the suspect. *See Conyers v. State*, 115 Md. App. 114, 121 (1997). Such impermissible suggestiveness "is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make." *Id*. The State points out that Ms. McKay was never thought to be an eyewitness to the murder of Mr. Hickey; she therefore was not asked to select the perpetrator from an array of photographs, an in-person lineup, or a single photograph.

As the State views the issue, and as the Court of Special Appeals held, this case does not implicate constitutional identification law and, consequently, does not provide grist for a suppression motion grounded in the due process analysis addressed in *Biggers* and *Manson*. The State urges this Court to embrace the distinction the Court of Special Appeals drew between what that court called a "selective identification" procedure governed by that constitutionally-based analysis and the identification procedure at issue in the present case. The State emphasizes that Ms. McKay was not asked whether she could declare that the person depicted in the video footage was the murderer of Mr. Hickey; instead, she was

12

asked to give her lay opinion as to whether the person she saw in the surveillance video was her former lover, Petitioner. Under those circumstances, the suppression court should have denied Petitioner's motion to suppress the admissibility of Ms. McKay's identification.

## IV.

### Analysis

Of the three questions Petitioner has presented for our consideration, we need only address the first: whether the Court of Special Appeals committed legal error in reversing the suppression court's grant of the motion to suppress Ms. McKay's identification of Petitioner as "look[ing] like" the person depicted in the surveillance camera's video footage. We disagree with Petitioner that the suppression court properly decided that the detectives obtained Ms. McKay's identification of him by way of an unconstitutional identification procedure. The Court of Special Appeals correctly concluded that constitutional identification law does not apply to the present case.

The focus of the Supreme Court's "identification law" jurisprudence is upon the imposition of due process limitations on efforts by the police to obtain from an eyewitness to the crime the identification of a criminal suspect. The line of cases begins with *Stovall v. Denno*, 388 U.S. 293 (1967).[6]

---

[6] *Stovall v. Denno* was one of three decisions the Supreme Court issued on the same day in June 1967. All three decisions addressed due process and fundamental fairness considerations associated with identification procedures. Two cases, *United States v. Wade*, 388 U.S. 218 (1967), and *Gilbert v. California*, 388 U.S. 263 (1967), focused on such considerations in the context of a formally accused individual's right to have counsel

13

The Court held in *Stovall* that identification testimony must be suppressed at trial if the confrontation between the eyewitness and the suspected criminal "was so unnecessarily suggestive and conducive to irreparable mistaken identification" as to violate a criminal defendant's right to due process of law. *Id.* at 302; *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (reiterating that due process protects against identifications that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"). *Stovall* and *Simmons* were followed by *Biggers*. The Supreme Court concluded in *Biggers* that even when a police procedure is determined to be unduly suggestive, the resultant identification ought not be suppressed if the identification itself is reliable. 409 U.S. at 201. *Manson* followed *Biggers* and applied the analysis described in *Biggers*.[7]

The *Biggers* Court set forth five factors to assess the reliability of pretrial identifications: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the

---

present at corporeal identifications. *See Wade*, 388 U.S. at 237; *Gilbert*, 388 U.S. 272. *Stovall* applied the due process/fundamental fairness analysis to identification procedures that occur *before* attachment of the suspect's Sixth Amendment right to counsel at formal accusation. *Stovall*, 388 U.S. at 302.

[7] Both *Neil v. Biggers* and *Manson v. Brathwaite* reached the Supreme Court of the United States by way of two state prisoners' efforts to obtain federal habeas corpus relief. Archie Biggers prevailed in the Sixth Circuit Court of Appeals, prompting Tennessee to seek further review in the Supreme Court, with the Warden of the State Penitentiary William S. Neil as the named petitioner. Nowell Brathwaite's case proceeded in similar fashion. After he prevailed in the Second Circuit Court of Appeals, Connecticut sought review in the Supreme Court, with Commissioner of Correction John Manson as the named petitioner.

14

criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. 409 U.S. at 199–200. Those five factors were applied in *Manson*, 432 U.S. at 114–16.

In that case, Petitioner Manson, see *supra* note 7, acknowledged the unnecessary suggestiveness of having an undercover police officer who, upon being shown a photograph of Respondent Brathwaite, identified him as the person from whom that officer purchased drugs. *Id*. at 109. The *Manson* Court, upon consideration of the five *Biggers* reliability factors, weighed those factors against the "corrupting effect of the suggestive identification itself." *Id*. at 114. The Court determined that, notwithstanding the suggestive nature of the identification procedure, it nonetheless was reliable and therefore admissible at Respondent Brathwaite's trial. *Id*. at 116.

Our brief review of the development of constitutional identification law from *Stovall* to *Simmons* to *Biggers* to *Manson* reflects the Supreme Court's "concern with the problems of *eyewitness* identification." *Manson*, 432 U.S. at 112 (emphasis added). The nature of the identification itself, coupled with the issues surrounding the identification procedure, has the potential to lead to misidentification. *Id.* The Court summarized why that can happen: "Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of a stranger can be distorted easily by the circumstances or by later actions of the police." *Id*.[8]

---

[8] The Supreme Court's most recent decision on the subject is *Perry v. New Hampshire*, 565 U.S. 228 (2012). In *Perry*, an eyewitness called the police and reported that a man was breaking into cars in the lot below her apartment. *Id*. at 233. After locating and

Nothing in *Biggers* or *Manson*, or any of the Supreme Court's decisions that precede those decisions, even intimates that the due process analysis that is applied to eyewitness identification procedures also governs a procedure that seeks instead to assist the police in ascertaining a suspect's identity. One need only view this case through the lens of the due process analysis in *Biggers* and *Manson* to appreciate, in the words of the State, why not:

> McKay, of course, did not "view the criminal at the time of the crime," so her "degree of attention" at the viewing is inapplicable; she gave no "prior description" of the perpetrator; and the "length of time between the crime" and when she was asked to view the surveillance tape would not affect reliability. Save for the "level of certainty" demonstrated by McKay when she identified [Petitioner], the *Biggers* factors cannot logically be applied because, unlike other identification cases, McKay did not witness anything.

The Court of Special Appeals concluded that Ms. McKay's identification of Petitioner in the surveillance footage did not seek, much less produce, what would be described as an eyewitness's "selective" identification of the sort that drives the Supreme Court's constitutionally-based identification law. *See Greene*, 240 Md. App. at 125. We agree.

The identification procedure at issue here sought information of an altogether different sort than what is sought in a selective identification procedure. Ms. McKay was not an eyewitness to the murder of Mr. Hickey and therefore was not asked to identify Petitioner as the murderer. Instead, what the detectives hoped to obtain from Ms. McKay was

questioning Perry in the parking lot, one officer stood with him while another officer went to speak with the eyewitness in her apartment. *Id*. at 233–34. Once in the apartment, the officer asked the eyewitness to describe the man she saw breaking into the cars. *Id*. at 234. In response to the officer's question, the eyewitness pointed to her kitchen window and said the man was standing in the parking lot next to the police officer. *Id*. The Supreme Court held that the Due Process Clause does not require a judicial inquiry into the reliability of an eyewitness identification if the identification is not procured under suggestive circumstances arranged by law enforcement. *Id*. at 245.

16

her opinion that the person depicted in the surveillance videotape was Petitioner. The record discloses multiple statements by the detectives urging Ms. McKay to say more than that the person depicted in the surveillance video (and still images derived from the video) "looks like [Petitioner]," "looks very much like him," and "looks more like him than it doesn't look like him." The detectives, hoping to extract from Ms. McKay greater certainty, repeatedly urged her to state, unequivocally, that she recognized the person in the video to be Petitioner.

Without doubt, the detectives' conduct was heavy-handed. Such conduct, however, had everything to do with encouraging Ms. McKay to be unequivocal in expressing her opinion as to whether or not Petitioner was the person captured by the surveillance camera. The pressure the detectives imposed upon Ms. McKay had nothing to do with the due process concerns that attend eyewitness identification procedures. Under the five-factor constitutional construct laid out in *Biggers* and *Manson*, "[t]o do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make." *Conyers*, 115 Md. App. at 121. *See also Biggers*, 409 U.S. at 198 (emphasizing that "the primary evil" the body of constitutionally-based identification law seeks to thwart is "a very substantial likelihood of [an eyewitness's] irreparable misidentification").

The Court of Special Appeals concluded that the police-initiated procedure at issue here is properly described not as a "selective identification"—because it is not one—but rather, as a "confirmatory identification." What the detectives sought from Ms. McKay was not information concerning the crime they were investigating; they sought instead her

17

opinion as to whether or not the person depicted in the surveillance video footage was Petitioner. However aggressive the detectives' conduct may have been, it did not implicate constitutionally-based identification law. Judge Moylan, speaking for the Court of Special Appeals, put a fine point on the matter:

> Improperly or excessively coaching a witness could be, of course, with respect to any subject. The problem of coaching a witness is not one associated with identification law particularly. . . . In the last analysis, any police behavior found to have been offending in this case unquestionably would have been the effort to encourage or cajole Jennifer McKay to testify with a greater degree of certainty. Offensive as that effort may have been, moreover, it had no apparent effect. All of which is to say, this is not a classic selective identification case.

*Greene*, 240 Md. App. at 130.

We agree with the reasoning and holding of the Court of Special Appeals that Ms. McKay's identification is not governed by the due process analysis in *Biggers* and *Manson*. It follows that the suppression court erred as a matter of law when it granted Petitioner's motion to suppress the identification on the ground that the police had engaged in "impermissibly suggestive" conduct, as that term is used in constitutionally-based identification law parlance.[9] Consequently, we affirm the judgment of the Court of Special Appeals.

---

[9] In an analysis we fully embrace, the Court of Special Appeals made clear why "the constitutional law governing identification procedures did not apply" to the present case. Nevertheless, that court, "purely *arguendo*," also considered the case through the lens of constitutional identification law. *Greene*, 240 Md. App. at 145. The Court of Special Appeals noted that, even if one were to assume that a due process analysis applies to the action of the detectives in this case and that their conduct was impermissibly suggestive, those assumptions would not require suppression of Ms. McKay's identification of Petitioner as the person depicted in the surveillance video. The identification, however hypothetically corrupted by impermissible suggestiveness, would survive at the second, ultimate

18

Before we conclude, we add a few words about the Court of Special Appeals' use of the label "confirmatory identification" to describe Ms. McKay's identification of Petitioner. Judge Moylan, writing for the court, searched for a "convenient shorthand reference or tag" to address identification procedures that do not implicate due process concerns. Judge Moylan found, and borrowed from, *People v. Rodriguez*, 593 N.E.2d 268, 269 (N.Y. 1992), the term "confirmatory identification" as a useful moniker for identifications of the sort at issue in this case. *Id*. at 131. The New York Court of Appeals attaches that label to both eyewitness and non-eyewitness identifications made by those who are so familiar with the suspect that the identification carries "little or no risk of misidentification."[10] We, like the Court of Special Appeals, find the "confirmatory identification" label equally applicable to the non-eyewitness identification we have in this case.[11]

---

step of the analysis because the identification was "reliable," given Ms. McKay's longstanding and, for a time, intimate relationship with Petitioner.

[10] In *Rodriguez*, the New York Court of Appeals used the label "confirmatory identification" in connection with that court's discussion of a court-recognized "familiarity exception" to a New York statutory scheme codifying a criminal defendant's due process entitlement to notice and opportunity to be heard. The "confirmatory identification" is an exception to the statute's requirement of a pretrial hearing on the admissibility of a suggestive pretrial identification. The focus of what is referred to as the "familiarity exception" is solely upon the identifier's level of familiarity with the suspect and applies when "as a matter of law, the witness is so familiar with the defendant that there is 'little or no' risk that police suggestion could lead to misidentification." 593 N.E.2d at 272. "In effect, it is a ruling that however suggestive or unfair the identification procedure might be, there is virtually no possibility that the witness could misidentify the defendant." *Id*.

[11] The Court of Special Appeals has referred to an identification as "confirmatory" in more than one context. *Compare Myers v. State*, 243 Md. App. 154, 161 (2019) (using "confirmatory identification" to describe an identification by a police officer who, while

19

# V.

## Conclusion

The detectives sought from Ms. McKay her opinion as to the identity of the person depicted on the surveillance camera videotape. They asked her if she could identify that person as Petitioner. Indeed, the detectives urged her to confirm their suspicion that the person depicted on the surveillance camera videotape is Petitioner. Regardless of the level of certainty in her identification, what Ms. McKay offered was not a selective identification of Petitioner as the murderer of Jon Hickey, but rather a confirmatory identification of him as a person she knew well. We therefore hold that the suppression court erred as a matter of law in granting Petitioner's motion to suppress that identification on the basis that the identification procedure was "impermissibly suggestive," as the identification at issue here does not implicate the constitutionally-based identification law paradigm.

---

investigating the crime, reviewed security camera footage and identified the person on the footage as someone he had known for several years and with whom he shared mutual friends), *with Bean v. State*, 240 Md. App. 342, 359 (2019) (analyzing a scenario in which an eyewitness to a crime first identified the defendant from social media and then later "confirmed" that identification at the police station when police provided the eyewitness a copy of the social media content and a single photograph of the suspect).

Some of our sister states and federal courts use the term "confirmatory identification," but not all uses are identical. *See State v. Pressley*, 181 A.3d 1017, 1020 (N.J. 2018) (using "confirmatory identification" to describe an eyewitness's identification of someone with whom he or she is familiar, such as a neighbor or acquaintance, but does not know his or her name); *People v. Wheeler*, 124 A.3d 1136, 1137–38 (N.Y. App. Div. 2015) (using "confirmatory identification" when a police officer who was an eyewitness to the crime confirms the defendant's identity "at a place and time sufficiently connected and contemporaneous to the arrest itself") (internal citation omitted); *United States v. Thomas*, 541 F. Supp. 2d 18, 28 (D.D.C. 2008) (using "confirmatory identification" when eyewitness police officer confirmed the defendant's identity "within minutes of the [crime]").

Should further proceedings in this case lead to a trial, Petitioner has an opportunity to seek exclusion of the identification by resort to one or more pertinent evidentiary rules. Further, should one or more of the detectives or Ms. McKay testify, Petitioner is entitled to cross-examine any or all of them about Ms. McKay's reluctance to identify Petitioner, without equivocation, as the person depicted on the surveillance camera's video footage. In the end, it would be for the factfinder, whether judge or jury, to decide how much, if any, weight to accord to that identification.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**