# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Justin Jamal Warner, Petitioner.

Appellate Case No. 2020-000930

───────────

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

───────────

Appeal from Anderson County
R. Lawton McIntosh, Circuit Court Judge

───────────

Opinion No. 28094
Heard November 8, 2021 – Filed April 13, 2022

───────────

## AFFIRMED IN PART AND REMANDED

───────────

Chief Appellate Defender Robert Michael Dudek and Appellate Defender Adam Sinclair Ruffin, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General W. Edgar Salter III, of Columbia, for Respondent.

───────────

**JUSTICE FEW:** A jury convicted Justin Jamal Warner of murder, attempted armed robbery, and possession of a weapon during the commission of a violent crime. The court of appeals affirmed. We granted Warner's petition for a writ of certiorari to address: (1) whether the trial court was correct to deny Warner's motion to suppress cell-site location information (CSLI)[1] seized from his cell phone service provider; and (2) whether an out-of-court viewing by Warner's probation officer of a crime-scene video and the officer's identification of Warner as the man in the video required a hearing under *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). We find the trial court correctly ruled the identification made from the video did not require a *Biggers* hearing. As to the CSLI, we hold the warrant the trial court found invalid because the warrant sought information stored in another state is not—at least for that reason—invalid. We affirm the court of appeals as to the *Biggers* issue and remand to the trial court for further proceedings as to Warner's motion to suppress CSLI.

## I.     Facts and History

On April 30, 2015, Warner entered the BP store at the intersection of I-85 and S.C. 153 in Anderson County. Warner showed his identification to the cashier for the purpose of purchasing cigars. The cashier—Mradulaben Patel—entered Warner's date of birth into the computerized cash register and opened it. Warner then pulled out a gun, pointed it at Patel, and attempted to reach into the cash drawer. When Patel resisted, Warner shot her. Warner then left the store without completing the robbery. Patel died several days after the shooting.

Officers from the Anderson County Sheriff's Office obtained video of the incident from security cameras installed at the store. On May 4, 2015, officers received an anonymous Crimestoppers tip alleging Warner was the person who committed the crimes. After reviewing the tip, officers realized Warner's date of birth matched the date Patel entered into the register. A detective then contacted Nathan Goolsby—

---

[1] "Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area." *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507, 515 (2018).

Warner's probation officer in Georgia—and sent him the crime-scene video. The detective asked Goolsby whether he could identify the person in the video as Warner. Goolsby then identified Warner as the person in the video.

Also on May 4, an Anderson County magistrate issued a warrant to "T-Mobile" authorizing the seizure of "subscriber information . . . from [Warner's cell number] starting on April 26, 2015 and continuing through May 4, 2015. Also tower locations to include physical addresses and or GPS coordinates." The warrant indicated it sought "records located at [an address in] New Jersey." A detective sent the warrant by facsimile to T-Mobile at the offices of its "Law Enforcement Relations Group" in New Jersey. Three days later, the Law Enforcement Relations Group responded—also by facsimile—stating, "This is in response to the Search Warrant, dated May 04, 2015, and served upon T-Mobile USA, Inc. on May 7, 2015." The facsimile response attached the requested records and indicated, "Original materials follow via US Mail."

An FBI expert testified the records showed Warner's cell phone communicating with cell towers near the location of the crime—indicating his presence near the BP store—at the general time the crime occurred.[2] The FBI expert's testimony was important to proving Warner committed the crimes because the State also proved Warner lived in a suburb of Atlanta, Georgia, over 130 miles from the BP store. The FBI expert's testimony indicated Warner drove along I-85 from the Atlanta area past S.C. 153 into Greenville County, and then returned to Anderson County in the general vicinity of the BP store at approximately the time of the crimes.

Warner moved to suppress the CSLI. During the suppression hearing, the State explained that cell phone providers like T-Mobile require a warrant to be sent to their offices in another state. The trial court summarily ruled the warrant was invalid because the requested records were stored in New Jersey, and it was "beyond the scope of authority of a [South Carolina] magistrate to obtain these records" in New Jersey. The trial court nevertheless denied the motion to suppress, finding the law at that time did not require a warrant. Warner also requested a *Biggers* hearing, contending Goolsby identified him in an unnecessarily suggestive identification procedure. The trial court ruled *Biggers* was not applicable because Goolsby was not an eyewitness and refused to conduct a hearing.

---

[2] The FBI expert was Special Agent David Church. The court of appeals extensively analyzed Special Agent Church's qualifications as an expert in CSLI as part of its analysis of the admissibility of his opinions. *State v. Warner*, 430 S.C. 76, 83-89, 842 S.E.2d 361, 364-67 (Ct. App. 2020).

Warner's trial took place from May 22 to May 25, 2017. After the jury convicted him, the trial court sentenced Warner to life in prison for murder and concurrent prison terms of twenty years for attempted armed robbery and five years for possession of a weapon during the commission of a violent crime. Warner appealed, and the court of appeals affirmed the trial court on all issues. *State v. Warner*, 430 S.C. 76, 842 S.E.2d 361 (Ct. App. 2020). We granted Warner's petition for a writ of certiorari only on the two questions explained above.

## II.    Motion to Suppress CSLI

Before 2014, courts generally did not even discuss whether the Fourth Amendment requires a warrant for digital information generated by or stored on a cell phone. *See generally United States v. Graham*, 824 F.3d 421, 428-29, 428-29 n.6, 429 n.7 (4th Cir. 2016) (en banc) (explaining the scant authority whether the Fourth Amendment protects CSLI, and citing federal and state cases nationwide); Eric Lode, Annotation, *Validity of Use of Cellular Telephone or Tower to Track Prospective, Real Time, or Historical Position of Possessor of Phone Under State Law*, 94 A.L.R. 6th 579 (2014). The Supreme Court's 2014 decision in *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), made clear the Fourth Amendment does protect digital information stored on a cell phone. *See State v. Brown*, 423 S.C. 519, 523-24, 815 S.E.2d 761, 763-64 (2018) (discussing *Riley*). When Warner murdered Patel in 2015, however, no South Carolina court—nor any federal court whose precedent binds our courts—had addressed whether the Fourth Amendment protects digital information derived from a cell phone but not stored on it, such as CSLI. In 2016, the Fourth Circuit found that it does not. *Graham*, 824 F.3d at 427.[3] According to the Fourth Circuit, "This holding accords with that of every other federal appellate court that has considered the Fourth Amendment question before us. Not one has adopted the Defendants' theory." 824 F.3d at 428.

---

[3] This opinion was issued by the Fourth Circuit sitting en banc. 824 F.3d at 424. In the panel decision—issued August 5, 2015—the Fourth Circuit held "the government conducts a search under the Fourth Amendment when it obtains and inspects a cell phone user's historical CSLI for an extended period of time." *United States v. Graham*, 796 F.3d 332, 344-45 (4th Cir. 2015). The court granted the government's petition for rehearing en banc on October 28, 2015, *United States v. Graham*, 624 F. App'x 75 (4th Cir. 2015), which vacated the panel decision, *Graham*, 824 F.3d at 424; *see also* 4th Cir. R. 35(c) (en banc proceedings) ("Granting of rehearing en banc vacates the previous panel judgment and opinion.").

In 2017, therefore, at the time of Warner's trial, it appeared that a person had no reasonable expectation of privacy in their CSLI held by a cell phone service provider and the Fourth Amendment did not require a warrant for the seizure of CSLI. The trial court in this case relied on *Graham* in finding the Fourth Amendment did not apply, stating "the search warrant under the *Graham* case was not needed." Based on *Graham*, the trial court found Warner's voluntary use of his cell phone and the consequent provision of CSLI to the cell phone service provider resulted in the loss of any expectation of privacy Warner may have otherwise had in the information.

In 2018, however—after Warner's trial and while his appeal was pending at the court of appeals—the Supreme Court held CSLI is subject to the warrant requirement of the Fourth Amendment. *Carpenter*, 585 U.S. at ____, 138 S. Ct. at 2217, 201 L. Ed. 2d at 525. The State had not challenged the trial court's ruling that the warrant was invalid, *Warner*, 430 S.C. at 92, 842 S.E.2d at 369, which left for the court of appeals only the question of whether the exclusionary rule should be applied. The court of appeals found the exclusionary rule should not apply and affirmed. 430 S.C. at 94, 842 S.E.2d at 370.

At oral argument before this Court, Justices raised difficult questions as to how—if South Carolina courts do not have authority to issue warrants for the seizure of records kept in another state—law enforcement may reasonably carry out its investigative responsibilities in this modern digital age. The answers, though sincere and realistic, were unsatisfactory. Therefore, and in light of our concerns that the trial court mistakenly found the warrant invalid, we find it necessary to analyze the validity of the May 4, 2015 warrant. As our Rules acknowledge, and as this Court has held many times, we may affirm on any ground appearing in the record. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling . . . upon any ground[] appearing in the Record on Appeal."); *State v. King*, 422 S.C. 47, 64 n.5, 810 S.E.2d 18, 27 n.5 (2017) (same); *State v. Johnson*, 278 S.C. 668, 669-70, 301 S.E.2d 138, 139 (1983) (same).[4]

---

[4] Technically, we are not affirming the denial of the motion to suppress. However, we are deciding the trial court's ruling will not be reversed on the basis that the warrant sought information stored in another state. If no other basis for reversing the denial of the motion to suppress arises on remand, then the result of our analysis of the validity of the warrant in this respect will be that we affirm.

The primary focus of the dispute before the trial court over the validity of this warrant was whether an Anderson County magistrate had the authority to issue the warrant to an out-of-state entity for records that are not physically located in this State. The applicable statute, section 17-13-140 of the South Carolina Code (2014), provides,

> Any magistrate . . .[5] may issue a search warrant to search for and seize . . . property constituting evidence of crime or tending to show that a particular person committed a criminal offense . . . . The property described in this section, or any part thereof, may be seized from any place where such property may be located, or from the person, possession or control of any person who shall be found to have such property in his possession or under his control.

This warrant was issued to T-Mobile. While we assume for purposes of our analysis T-Mobile stores the applicable records in New Jersey,[6] the important fact is T-

[5] The omitted text contains as many as three additional items in a series, followed by the limiting language ". . . having jurisdiction over the area where the property sought is located." § 17-13-140. We find the limiting language applies only to the last item in the series, not to "Any magistrate," which is the first item in the series. *See Comm'rs of Pub. Works of the City of Laurens v. City of Fountain Inn*, 428 S.C. 209, 219-20, 833 S.E.2d 834, 839 (2019) (Few, J., concurring) (explaining that under the last antecedent doctrine, the absence of a comma after the last item in a series indicates the modifying clause following the series applies only to the last item in the series). In addition, to read the limiting language as applying to all items in the series would contradict—and render superfluous—the language enabling the seizure of property within the "control of any person," because if all seizures are limited to property inside the jurisdiction of the individual judge, it would not have been necessary to alternately authorize the seizure of property was under a person's control.

[6] There is no evidence in the record to support this assumption other than the fact law enforcement officers were required to submit the warrant to the T-Mobile Law Enforcement Relations Group, which is located in New Jersey. In fact, the FBI Special Agent who testified as the State's expert on CSLI—when asked where the records were stored—did not testify where the records are stored. He stated only that the records are "generated" in New Jersey, "[New Jersey is] where T-Mobile's compliance people are, where they generate -- where all the requests go to and they

Mobile clearly does business in South Carolina, in particular, in Anderson County. T-Mobile, therefore, is subject to the jurisdiction of an Anderson County magistrate. The warrant sought records reflecting information generated in South Carolina through the interaction of Warner's cell phone and cell towers in Anderson County. While the T-Mobile office to which officers were told to send the warrant is located in New Jersey, section 17-13-140 specifically provides, "The property described in this section . . . may be seized . . . from the person, possession or control of any person who shall be found to have such property in his possession or under his control." T-Mobile is in possession and control of property that section 17-13-140 permits to be seized. T-Mobile is a "person" doing business in Anderson County. Thus, T-Mobile is subject to the jurisdiction of our courts, and we find it was not beyond the power of the magistrate to issue the warrant.

Our determination that the warrant was not invalid for the reason relied on by the trial court raises other questions. Warner argued in his suppression motion, for example, the affidavit supporting the warrant did not set forth probable cause. We agree. The affidavit states only, "Information was received through crime stoppers indicating that Justin Warner is a possible suspect. The informant's information was corroborated and a record search revealed that Warner has this listed number to him." While we have recognized—recently—that "[p]robable cause . . . is not a high bar," *State v. Jones*, 435 S.C. 138, 145, 866 S.E.2d 558, 562 (2021) (quoting *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 1103, 188 L. Ed. 2d 46, 62 (2014)), it is by no means a toothless standard. *See Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11, 93 L. Ed. 1879, 1890 (1949) (stating probable cause "has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed"). The affidavit attached to this warrant provided the magistrate no facts or circumstances whatsoever; only the conclusory statement that some unnamed person considered Warner as a suspect based on unprovided information.[7] It is

generate those [records]. The actual records are pulled from the different switches, but [New Jersey is] where the record is generated from . . . ."

[7] The Supreme Court's statement in *Kaley*, which we quoted in *Jones*, was made to support the Supreme Court's continued refusal "to require the use of adversarial procedures to make probable cause determinations" in grand jury proceedings. *Kaley*, 571 U.S. at 338, 134 S. Ct. at 1103, 188 L. Ed. 2d at 62. The Supreme Court's statement in *Brinegar* was made in explaining probable cause

inconceivable to us that the magistrate did not require the experienced detective to supplement the affidavit with sworn testimony, or if the magistrate did not require it, that the detective did not provide it on his own. It is unclear, however, whether the information in the affidavit was supplemented before the magistrate issued the warrant. Because the record on this issue—and perhaps other issues—was never fully developed during the suppression hearing, we remand to the trial court for a ruling on any unresolved issues related to Warner's motion to suppress. *See State v. Johnson*, 302 S.C. 243, 249, 395 S.E.2d 167, 170 (1990) (finding the affidavit attached to the search warrant lacked probable cause, but remanding to develop the

---

existed to support a search incident to a warrantless arrest. *Brinegar*, 338 U.S. at 170-71, 69 S. Ct. at 1308, 93 L. Ed. at 1888. In *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), even after abandoning the "two-pronged test" the Supreme Court previously applied, 62 U.S. at 238, 103 S. Ct. at 2332, 76 L. Ed. 2d at 548, the Court addressed a hypothetical basis for a search warrant much like the situation presented by the affidavit in this case:

> Our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that 'he has cause to suspect and does believe that' [a crime has been committed] will not do. An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and [a] wholly conclusory statement . . . fail[s] to meet this requirement. An officer's statement that 'affiants have received reliable information from a credible person and do believe' that heroin is stored in a home, is likewise inadequate. . . . [T]his is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.

62 U.S. at 239, 103 S. Ct. at 2332-33, 76 L. Ed. 2d at 548-49.

record as to whether the affidavit was supplemented; explaining possible results on remand).  If the trial court determines the affidavit was not supplemented, and thus the warrant lacked probable cause, the trial court should also consider whether the exclusionary rule should apply.

### III.    *Neil v. Biggers* **Hearing**

Warner also argues the trial court erred by refusing to conduct a hearing to determine whether Goolsby's identification of Warner in the crime-scene video violated his due process rights under *Biggers*.  Warner relies on a line of cases decided by the Supreme Court of the United States in which the Court held that unnecessarily suggestive police-arranged eyewitness identification procedures violate due process and, thus, are inadmissible, unless the trial court determines in a hearing that the identification was nevertheless so reliable that no substantial likelihood of misidentification exists.  *See Perry v. New Hampshire*, 565 U.S. 228, 237-39, 132 S. Ct. 716, 723-25, 181 L. Ed. 2d 694, 706-07 (2012) (discussing the line of cases and explaining the Supreme Court "[s]ynthesiz[ed]" them into a two-part test in *Biggers*); *State v. Liverman*, 398 S.C. 130, 138, 727 S.E.2d 422, 426 (2012) (reciting *Biggers* test).  Under *Biggers*, the trial court must first determine whether the police used an "'unnecessarily suggestive' . . . identification procedure[]," *State v. Wyatt*, 421 S.C. 306, 310, 806 S.E.2d 708, 710 (2017) (citing *Biggers*, 409 U.S. at 198-99, 93 S. Ct. at 381-82, 34 L. Ed. 2d at 410-11), and second, if so, "whether the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed," 421 S.C. at 311, 806 S.E.2d at 710 (quoting *Liverman*, 398 S.C. at 138, 727 S.E.2d at 426).

The trial court in this case refused to conduct a *Biggers* hearing because Goolsby was not an eyewitness.  The court stated, "I don't believe . . . this is a *Biggers* situation.  You don't have an out-of-court identification [by] an eyewitness."  We agree with the trial court.  In every case decided by the Supreme Court or by this Court under *Biggers* and the line of cases that led to it, the witness who made the identification was an eyewitness to the crime itself, a witness who observed the crime take place in real time.  The Supreme Court has given no reason to believe it would extend the *Biggers* analysis beyond eyewitnesses, nor has this Court.  In *Perry*, the Supreme Court prefaced its discussion of the line of cases leading to *Biggers* by stating, "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' have we imposed a constraint tied to the Due Process Clause."  565 U.S. at 237, 132 S. Ct. at 723, 181 L. Ed. 2d at 706 (citations omitted).  The dangers of misidentification associated with eyewitness identification that threaten "fundamental conceptions of justice" are simply not

present in a situation like the one in this case. While we agree with Warner the detective's question suggested to Goolsby that Warner is the man in the video, we nevertheless find Warner's due process rights do not require a hearing because Goolsby was not an eyewitness to the crime, and thus, *Biggers* does not apply.[8]

The trial court did not err in denying Warner a hearing as to Goolsby's identification.

## IV. Conclusion

We affirm the trial court's refusal to conduct a hearing under *Biggers* because Goolsby was not an eyewitness. As to Warner's motion to suppress CSLI, we find the warrant was not invalid for the reasons the trial court recited. We remand to the trial court for further proceedings.

**AFFIRMED IN PART AND REMANDED.**

**BEATTY, C.J., KITTREDGE and JAMES, JJ., concur. HEARN, J., dissenting in a separate opinion.**

---

[8] Our court of appeals reached the same conclusion in *State v. McGee*, 408 S.C. 278, 758 S.E.2d 730 (Ct. App. 2014). There, the court found the identification was not subject to a *Biggers* analysis because the witness who made the identification "was not an eyewitness to the crime." 408 S.C. at 286, 758 S.E.2d at 735. In a recent decision by the Court of Appeals of Maryland on almost identical facts, the court held the "identification is not governed by the due process analysis in *Biggers*." *Greene v. State*, 229 A.3d 183, 193 (Md. 2020). Before reaching that conclusion, the Court of Appeals of Maryland conducted a thorough analysis of the same line of Supreme Court cases discussed above. 229 A.3d at 192-94. After our own thorough review of decisions on this point nationwide, we are aware of no court that has held the *Biggers* analysis extends to witnesses who are not "eyewitnesses."

**JUSTICE HEARN:** Because I agree with the decision and analysis of the court of appeals, I respectfully dissent. The court of appeals analyzed this pre-*Carpenter* Fourth Amendment violation under the standard set forth in *Davis* and concluded the exclusionary rule does not apply, which I believe was the correct approach. *See Davis v. United States*, 564 U.S. 229, 241 (2011) (holding searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule). I would end the matter there and not remand for a hearing. While I concede that probable cause was raised before the circuit court, the primary focus of the hearing was the privacy interests impacted by release of cell-site location data, and the circuit court denied the motion to suppress on that basis alone. I would not resurrect the probable cause issue now because the exclusionary rule would not serve any deterrent purpose and even assuming error in the denial of the motion to suppress, I would hold any error harmless.

The court of appeals found that the purposes of the exclusionary rule would not be honored in this case, and I agree completely with that determination. Here, the search warrant was issued under existing law that has since been changed. *Compare Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (holding that a person has an expectation of privacy in cell phone records held by a third party, thereby abrogating *Graham*'s extension of *Miller* to cell-site location information or "CSLI"), *with United States v Graham*, 824 F.3d 421, 427 (4th Cir. 2016) (finding no expectation of privacy in cell phone records held by a third party because of the third-party doctrine of *Miller*); *United States v. Miller*, 425 U.S. 435, 440 (1976) (holding bank depositor had no Fourth Amendment interest in bank records). While there is no dispute *Carpenter* applies retroactively, as the court of appeals correctly reasoned, applying the exclusionary rule is not called for when the behavior of the officers was made in either good faith or isolated simple negligence. Here, the officers were operating under the belief that Warner had no expectation of privacy in his cell phone records, and at the time, under the persuasive authority of *Graham* and the binding authority of *Miller*, that was true.

As an appellate court, we are required to balance the interests of the exclusionary rule with the "heavy toll on both the judicial system and society at large." *Davis v. United States*, 564 U.S. 229, 237 (2011). The rule was designed to serve as a last resort to deter officer misconduct and error. *Id* at 236 and *Elkins v. United States*, 364 U.S. 206, 217 (1960) (holding the exclusionary rule is "calculated to prevent, not to repair"). Here, there would be no deterrence of officer misconduct or error in excluding the evidence because, at the time of the search, officers acted in compliance with current law. We can neither expect officers to predict future decisions of appellate courts nor take them to task for their failure to do so.

Therefore, because the deterrent effect of the exclusionary rule would not be served here, I would not apply it. *See State v. Weston*, 329 S.C. 287, 293, 494 S.E.2d 801, 804 (1997) (stating "[s]uppression is appropriate in only a few situations"); *State v. Sachs*, 264 S.C. 541, 566, 216 S.E.2d 501, 514 (1975) (stating "[t]he exclusionary rule is harsh medicine," and "[e]xclusion should be applied only where [the purpose of] deterrence is clearly subserved").

Moreover, even assuming *arguendo* the circuit court erred in denying the motion to suppress, any error was harmless. When improper evidence is "merely cumulative" its admission is harmless beyond a reasonable doubt, and the conviction should not be reversed. *See State v. Haselden*, 353 S.C. 190, 197, 577 S.E.2d 445, 449 (2003) and *State v. Baccus*, 367 S.C. 41, 55-56, 625 S.E.2d 216, 224 (2006). Here, the CSLI data was clearly cumulative to a myriad of evidence which tied Warner to this crime: he was identified on the store's security footage by his probation officer, his birthday was entered into the store's computer during the fatal check-out, and his palm print matched one taken from the store's counter.[9] Further, the store's security video also captured the robber's vehicle at the scene, which closely resembled the same car Warner drove immediately before his arrest. Once investigators impounded Warner's vehicle, they found cigar wrappers similar to those purchased during the robbery and Warner's wallet, which resembled the one in the video of the robbery. In short, the use of his CSLI data was merely cumulative to other ample evidence, rendering any error harmless.

For the forgoing reasons, I respectfully dissent.

---

[9] The record reflects that the counter was cleaned approximately forty-five minutes before the crime. Seven individuals, including Warner, were in the store between the wiping of the counter and the robbery—five or six of whom approached the counter. However, it is clear no one besides Warner was involved in the robbery or murder.