*Andy E. Reyes v. State of Maryland, No. 1426, Sept. Term 2021. Opinion by Albright, J.*

**Criminal Procedure – Identifications Generally**

During a confirmatory identification, a witness is asked to confirm that a suspect is the person the witness knew from before the crime. In contrast, during a selective identification, a witness attempts to select and identify an unknown perpetrator after being presented with at least one suspect.

**Criminal Procedure – Confirmatory Identifications – Constitutional Analysis**

The difference between confirmatory and selective identifications stems from constitutional concerns arising from identifying an unknown perpetrator. A confirmatory identification relies upon a witness's prior familiarity with a suspect. Thus, in a typical confirmatory identification, the risks of impermissible suggestion do not apply to nearly the same extent as in a selective identification.

**Criminal Procedure – Confirmatory Identifications – Constitutional Analysis**

When a confirmatory identification is supported by sufficient familiarity, the identification is constitutionally reliable. Police suggestion will be irrelevant, and courts need not perform a full selective identification analysis.

**Criminal Procedure – Confirmatory Identifications – Sufficient Familiarity**

Sufficient familiarity means that the witness is so familiar with the defendant from before the crime that there is little or no risk that police suggestion could lead to a misidentification. We look to the whole circumstances, including the number of times the witness viewed the defendant prior to the crime, the duration and nature of the encounters, the setting, the period of time over which the viewings occurred, the time elapsed between the crime and the previous viewings, and whether the two had any conversations, and whether the witness told the police prior to being shown defendant's photograph that the witness recognized the perpetrator.

**Criminal Procedure – Confirmatory Identifications – Sufficient Familiarity**

The bar for sufficient familiarity is not high. Sufficient familiarity is typically present when the suspect is a family member, former friend, or long-time acquaintance of a witness, but a prior relationship that is fleeting or distant may not allow a witness to withstand impermissible suggestion or allay due process concerns.

Circuit Court for Anne Arundel County
Case No. C-02-CR-20-480

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*


No. 1426

September Term, 2021

_____

ANDY E. REYES

v.

STATE OF MARYLAND

_____

Reed,
Albright,
Salmon, James P.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Albright, J.

_____

Filed:  March 29, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a
constitutional amendment changing the name of the Court of Special Appeals of
Maryland to the Appellate Court of Maryland. The name change took effect on December
14, 2022.

Following a jury trial in the Circuit Court for Anne Arundel County, Appellant, Andy Reyes, was convicted of the attempted first-degree murder of Daniel Bartley and other related offenses.[1] Prior to trial, Mr. Reyes moved to suppress Mr. Bartley's pretrial and expected in-court identification of Mr. Reyes as the shooter, arguing that the pretrial identification was impermissibly suggestive as based on a single-photo "photo array." Mr. Reyes also moved to exclude certain video and photographic evidence. The circuit court denied Mr. Reyes's motions and, during trial, sustained the State's objection that limited the scope of his cross-examination of Mr. Bartley. After determining that several of the charges merged for the purposes of sentencing, Mr. Reyes was sentenced to, among other things, 50 years of executed incarceration.[2]

On appeal, Mr. Reyes presents several issues for our consideration, which we have consolidated and rephrased into three:[3]

---

[1] Mr. Reyes was also found guilty of first-degree assault, reckless endangerment, carrying a loaded handgun, and using a firearm in committing a crime.

[2] More specifically, Mr. Reyes received a sixty-year sentence for attempted first-degree murder, with all but forty suspended. He also received a consecutive ten-year sentence for use of a firearm in committing a crime of violence, with the first five years to be served without the possibility of parole.

[3] As originally phrased, Appellant presented the following questions:

> Whether the Circuit Court abused its discretion [sic] when it admitted the identification of appellant where the identification procedure was impermissibly suggestive?
>
> Whether the Circuit Court abused its discretion when it admitted nest camera video footage, as well as photographic

1. Whether the Circuit Court erred when it declined to suppress Mr. Bartley's pretrial identification of Mr. Reyes as the shooter.

2. Whether the Circuit Court abused its discretion when it admitted surveillance camera footage and still images derived from that footage.

3. Whether the Circuit Court abused its discretion when it prohibited cross-examination into Mr. Bartley's prior conviction for assaulting Ms. Barahona and an unrelated assault of her allegedly perpetrated by Mr. Bartley hours before the shooting.

We hold that the circuit court did not err in declining to suppress Mr. Bartley's pretrial identification of Mr. Reyes as the shooter. Nor did it abuse its discretion in admitting surveillance camera footage (and still images derived from that footage) and in limiting cross-examination of Mr. Bartley. Accordingly, we will affirm the circuit court's judgments.

## **BACKGROUND**

### *A. The Shooting*

On December 28, 2019, in the early morning, Mr. Bartley walked to pick up some of his belongings from his girlfriend, Emily Barahona, at a church close to her house.

---

stills derived from this video, where the video footage was not properly authenticated?

Whether the Circuit Court abused its discretion when it excluded testimony about the history of domestic violence between Daniel Bartley and Emily Barahona?

Whether the Circuit Court abused its discretion in its limitation of the cross-examination of Daniel Bartley, where Appellant's counsel was prohibited from inquiring as to the altercation between Emily Barahona and Daniel Bartley that occurred hours before the shooting?

When Mr. Bartley arrived, he saw Ms. Barahona's car but did not see her. Mr. Bartley then noticed an individual walking toward him. The individual stopped approximately ten feet in front of Mr. Bartley, where, under the glow of a streetlight, Mr. Bartley was able to recognize the individual as Mr. Reyes, Ms. Barahona's longtime friend.

This was not the first time Mr. Bartley met Mr. Reyes; the two met through Ms. Barahona on several occasions, the first being six months prior. As before, Mr. Reyes and Mr. Bartley spoke to each other. Approximately twelve seconds later, and without provocation, Mr. Reyes pulled out a gun and aimed it at Mr. Bartley's head. Mr. Bartley ducked, and Mr. Reyes started shooting. He shot Mr. Bartley eleven times. Mr. Bartley fell to the ground and yelled for help.

A nearby resident heard the shots. Peering outside her bedroom window, she saw Mr. Bartley fall to the ground between a parked car and the curb. She grabbed towels, ran to Mr. Bartley, pressed the towels to his wounds, and waited for help to arrive.

Separately, in a nearby house where Robert Stevvings lived with his grandparents, a motion-activated security camera captured the scene of the shooting. After hearing the gunshots, Mr. Stevvings's grandmother went outside and saw her neighbors attending to Mr. Bartley, and then called emergency services. After the police arrived, Mr. Stevvings told officers that, at around the time that his grandmother heard the shooting, he received an alert on his phone that the home security camera had begun recording. Mr. Stevvings later reviewed the footage and emailed it to the police.

## B. The In-Hospital Identification

Detective Stephen Davis investigated the shooting and visited Mr. Bartley twice in

the hospital. At the first visit, two days after the shooting, Mr. Bartley told Detective Davis that Mr. Reyes had shot him, though he could not recall Mr. Reyes's full name. He also provided additional information about Mr. Reyes, including Mr. Reyes's known hangouts, the name of the restaurant Mr. Reyes frequented with Ms. Barahona, and how he came to know Mr. Reyes.[4]

> [DETECTIVE DAVIS]: Can you tell me what happened? I know it is hard for you to talk, it is okay. Take your time if you have to, okay?
>
> * * *
>
> [MR. BARTLEY]: Emily.
>
> [DETECTIVE DAVIS]: Emily okay.
>
> [MR. BARTLEY]: She didn't shoot me.
>
> [DETECTIVE DAVIS]: She didn't shoot you.
>
> [MR. BARTLEY]: Her friend shot me.
>
> [DETECTIVE DAVIS]: Do you know her friend's name?
>
> [MR. BARTLEY]: Andy - -
>
> [DETECTIVE DAVIS]: What is it?
>
> [MR. BARTLEY]: Andy.
>
> [DETECTIVE DAVIS]: Andy? Does Andy come around the hood? Does he come around the neighborhood there? You know his last name?
>
> [MR. BARTLEY]: He lives downtown.
>
> [DETECTIVE DAVIS]: He lives downtown. Andy from

---

[4] Detective Davis's recorded interviews with Mr. Bartley were played at the circuit court's suppression hearing. We use excerpts from the recordings and transcripts of the testimony to supplement the factual background.

4

downtown, Emily's friend.

> [MR. BARTLEY]: Yes, they go to this bar called Mi Cantu.

> * * *

> [MR. BARTLEY]: Andy's parents' bar.

> [DETECTIVE DAVIS]: It is Andy's parents' bar. Okay. And have you met Andy before?

> [MR. BARTLEY]: Yeah.

> [DETECTIVE DAVIS]: So if I showed you pictures of Andy, you would know and be able to point him out?

> [MR. BARTLEY]: Yeah.

When Detective Davis returned to the hospital a few days later, Mr. Bartley reiterated that it was Mr. Reyes who shot him and that he could recognize Mr. Reyes in a photograph.

> [MR. BARTLEY]: She texted me and told me to get --- and that it is --- that is when he shot me. I am --- I was walking down and I saw somebody walking up and I thought that was him but I wasn't certain. I saw him coming. So I ended up getting shot right by her house because he was walking up and I was walking down.

> * * *

> [DETECTIVE DAVIS]: You said that you were familiar with Andy and you recognized him when you saw him walk out. I am going to show you a picture and let me know if it is Andy. Okay?

> [MR. BARTLEY]: That is Andy.

Several months later, in April 2020, Mr. Reyes was charged with attempted first-degree murder and other related crimes. He then moved to suppress Mr. Bartley's pretrial and expected in-trial identification of Mr. Reyes.

5

## C. The Suppression Hearing

At the suppression hearing in September 2020, Mr. Reyes sought to suppress the identifications on the ground that showing Mr. Bartley a single photograph rather than a true photo array was impermissibly suggestive. The circuit court agreed, and then asked the State to show that the identification was sufficiently reliable to negate the effect of the impermissibly suggestive procedure. In response, the State called Detective Davis to testify.

Detective Davis explained that during his first visit, Mr. Bartley told him that Ms. Barahona and the man who shot him were "linked together," so he "searched Emily Barahona on Facebook" and "found a Facebook post . . . with [] Andy – Andy Reyes and Ms. Barahona." Detective Davis further testified that he "snip[ped] a photograph of Mr. Reyes's face" from the Facebook photograph and put the information through Dashboard—Maryland State's facial recognition software.[5] Dashboard's multi-database search of the Facebook photograph returned a positive match to a photograph of Mr. Reyes from the Maryland Motor Vehicle Administration.

The State next called Mr. Bartley as a witness. Mr. Bartley testified that Detective Davis never told him whom to identify as the shooter. Instead, Mr. Bartley explained that

---

[5] Mr. Reyes timely objected to the introduction of the photograph on the ground that the State's use of facial recognition software was not provided in discovery. In response, the circuit court stated, "the question [] right now is whether or not the identification is one that can be relied upon, . . . whether [that information] should have been provided to you in discovery is a different matter." Mr. Reyes also raised a separate relevance objection, which the circuit court overruled. Mr. Reyes does not challenge those rulings on appeal, and we do not address them further.

he first met Mr. Reyes six months before the shooting and knew him through Ms. Barahona—Mr. Bartley's then-girlfriend. Mr. Bartley reiterated that he identified Mr. Reyes to Detective Davis as the shooter, not the other way around.

Following a brief cross-examination, the parties rested. The circuit court ruled that Mr. Bartley's identification of Mr. Reyes was reliable because, among other things, Mr. Bartley had the opportunity to view Mr. Reyes at the time of the crime, had met him several times before, and knew with whom Mr. Reyes associated.

### D. The Trial

1. The security camera footage and still images

In April 2021, on the first day of Mr. Reyes's trial, the State called Mr. Stevvings to testify about the video surveillance footage captured on his home security camera, which had recorded the shooting of Mr. Bartley.[6] Mr. Stevvings testified that he installed that camera in the front window of his house, and he provided additional information about how it worked, including that it was Wi-Fi-enabled and motion-activated, and sends an alert to his phone when it begins and ends recording. Mr. Stevvings also testified that the State's exhibit containing his camera footage accurately depicted the conditions on the night of the shooting and was the same footage that he emailed to the police.

The defense objected to the video footage, arguing that the State did not lay a sufficient foundation for authentication because the video was not a photograph, so "it

---

[6] The security camera is a Nest camera manufactured and sold by Google.

7

ha[d] a whole different set of authentication questions that must be asked." The circuit court ultimately overruled the objection and admitted the video, finding that the State laid a sufficient foundation:

> [THE COURT]: Well, I think he has – testified that the video on the disk is the same video – not the actual physical disk, but it is the same video that he emailed to the police. So I think he said that he viewed that and that is the video from his . . . camera. So I disagree with the Defense.

Later in the trial, the State also introduced photographs into evidence that depicted the scene of the shooting. These photographs were stills taken from the earlier-admitted video footage, and Mr. Bartley further testified that the photographs "accurately depict[ed]" the scene on the night of the shooting. Mr. Reyes objected to the photographs on the same basis that he had previously objected to the video footage, and the circuit court overruled the objection.

2. The exclusion of Mr. Bartley's alleged prior assaults

At the end of the first day of trial, the State moved to exclude Mr. Bartley's prior conviction for assaulting Ms. Barahona as well as a second, unreported assault of her that allegedly occurred several hours before the shooting. The State asserted that the prior conviction was inadmissible propensity evidence, and the alleged assault was also inadmissible on cross-examination of Mr. Bartley unless Mr. Reyes took the stand to argue his actions were in defense of another person. Mr. Reyes argued that the assaults and Mr. Bartley's alleged violent nature may or may not be relevant to Mr. Reyes's defense but may explain why Mr. Bartley would falsely blame Mr. Reyes for shooting him. Mr. Reyes further argued that the State sought to exclude Mr. Bartley's allegedly

8

violent history because the State feared that his propensity for violence could generate a defense of others jury instruction. Yet, Mr. Reyes proffered no evidence in support of either contention.

After considering the parties' arguments, the circuit court concluded that neither the prior conviction nor the alleged assault on Ms. Barahona was relevant because Mr. Reyes did not claim self-defense or defense of others. Subsequently, the court granted the State's motion.

> [THE COURT]: Based on the evidence, the Court has heard thus far and the proffers of counsel, the Court does not find that Mr. Bartley's alleged violent character is a pertinent character trait. Self-defense has not been asserted and the defense of others would not apply as under the Defendant's best case scenario, the alleged assault occurred several hours before this incident. Too much time had lapsed for the defense of others, nothing indicates anyone was in immediate or imminent danger of bodily harm.
> To the contrary, the allegation is that the assault had already occurred several hours earlier. I am going to exercise my discretion in this --- to sustain the State's objection to the Defense introducing any evidence regarding these two alleged assaults on Ms. Barahona by Mr. Bartley. Defendant indicated that they wished to introduce this evidence indicating that Mr. Bartley is a very violent person with repeated interactions with the police. And at this point, I simply think that that is not relevant, it is not a relevant character trait.

With permission of the Court, the defense also proffered that Mr. Bartley had called Ms. Barahona approximately 100 times in the hours prior to the shooting, that he had arrived at her door, and that Ms. Barahona repeatedly told him to leave her alone. Mr. Reyes did not introduce any evidence to support that proffer, further explain how the proffered information was relevant, or at any time request a jury instruction on the issue

of defense of others.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress, we "rely solely upon the record developed at the suppression hearing[,]" *Briscoe v. State*, 422 Md. 384, 396 (2011), and view the evidence and inferences drawn from the record "in the light most favorable to the prevailing party, in this case, the State[,]" *Angulo-Gil v. State*, 198 Md. App. 124, 137 (2011). We also "give great deference to a hearing judge's determination and weighing of first-level findings of fact [and] will not disturb either the determinations or the weight given to them, unless they are shown to be clearly erroneous." *Longshore v. State*, 399 Md. 486, 498 (2007). "Issues of law—specifically whether a constitutional right has been violated—receive no deference." *Bean v. State*, 240 Md. App. 342, 354 (2019). Instead, "we apply a *de novo* standard of review, making our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Brewer v. State*, 220 Md. App. 89, 99 (2014) (cleaned up).

Typically, we review evidentiary rulings for an abuse of discretion.[7] *See Vigna v. State*, 470 Md. 418, 437 (2020). A court abuses its discretion when it "acts without reference to any guiding principles, and the ruling under consideration is clearly against the logic and effect of facts and inferences before the court." *Sibley v. Doe*, 227 Md. App.

---

[7] Of course, not all evidentiary rulings are subject to an abuse of discretion review. *See, e.g.*, *Williams v. State*, 457 Md. 551, 563 (2018) ("When the circuit court determines whether a piece of evidence is relevant, that is a legal conclusion, which is reviewed without deference."); *Gordon v. State*, 431 Md. 527, 535-36 (2013) ("[H]earsay rulings are not discretionary.").

645, 658 (2016) (quotation omitted). Thus, we will reverse for an abuse of discretion if "the trial judge's determination was both manifestly wrong and substantially injurious." *Angelakis v. Teimourian*, 150 Md. App. 507, 525 (2003) (quotation omitted). Further, the "exclusion of evidence is a function of the trial court which, on appeal, is traditionally viewed with great latitude." *Id.* at 525 (quotation omitted). Regardless of the purpose of excluded evidence, in order to challenge the exclusion on appeal, "a party who objects . . . must make the grounds for a different ruling manifest to the trial court at a time when the court can consider those grounds and decide whether to make a different ruling." *Peterson v. State*, 444 Md. 105, 124-25 (2015).[8]

## DISCUSSION

### A.  Mr. Bartley's Identification Of Mr. Reyes

On appeal, Mr. Reyes argues that the circuit court erred in refusing to suppress his identification by Mr. Bartley.[9] He points out that Mr. Bartley was shown only a single

---

[8] Even during cross-examination, a proponent, when challenged, "must be able to describe the relevance of, and factual foundation for, a line of questioning. . . . The rules governing appellate review reflect the same principles." *Peterson*, 444 Md. at 125 (citation omitted); *see also* Md. Rule 8-131(a).

[9] Mr. Reyes focuses his argument on the pretrial identification rather than the later identification at trial. We do the same. A trial identification typically presents a weaker case for suppression because it is subject to the corrective influence of cross-examination. *See State v. Greene*, 240 Md. App. 119, 154-55 (2019), *aff'd*, 469 Md. 156 (2020) (even if police had influenced a witness's pretrial identification to some extent, "strong, forceful, and persuasive cross examination by defense counsel" after an in-trial identification could at least partly ameliorate that influence in the presence of the jury). As such, if the circuit court did not err in refusing to suppress the pretrial identification, it likewise did not err in refusing to suppress the in-trial identification.

11

photograph (of Mr. Reyes) during the police investigation, and the circuit court determined that this identification procedure was impermissibly suggestive. He then argues that the circuit court erred in failing to suppress the resulting identification because, in his view, the record did not support that the identification was otherwise constitutionally reliable. In response, the State relies upon the same analytical framework but urges the opposite conclusion: that the identification procedure was not impermissibly suggestive and, in any event, that the identification was constitutionally reliable in all the circumstances.

We agree with the circuit court that Mr. Reyes's motion to suppress should have been denied. Our analysis, however, is somewhat different. We first distinguish between a "selective" identification on the one hand and a "confirmatory" identification on the other. As we will discuss, a confirmatory identification is a different type of procedure that does not necessarily implicate the constitutional concerns of a selective identification, nor always demand the same level of analysis. Next, we conclude that the circuit court did not err in refusing to suppress the confirmatory identification of Mr. Reyes because it was supported by sufficient familiarity. As such, a more detailed constitutional analysis is unnecessary, and in any event, would return the same result.

    1. <u>The identification of Mr. Reyes was not selective, but confirmatory</u>

Typically, a selective identification occurs when an eyewitness observes an unknown perpetrator commit a crime and then views suspects in an effort to select and identify the perpetrator to law enforcement. This type of identification is often made by the witness as part of a formal procedure, during which the witness "is asked to select the

wrongdoer from a line-up of suspects, to select a photograph . . . from a photographic array, or otherwise to select the wrongdoer from a larger group[.]" *State v. Greene*, 240 Md. App. 119, 125 (2019), *aff'd*, 469 Md. 156 (2020).[10] It need not, however, involve a large group of suspects.[11] Its defining feature is simply that there is a "selection process" in which a witness, without any independent experience with the suspect or suspects from before the crime, attempts to select and identify the perpetrator after being presented with at least one suspect. *See Greene*, 240 Md. App. 119, 125 (2019).

In contrast, a confirmatory identification is typically an informal procedure that relies upon a witness's prior familiarity with a suspect. During a confirmatory identification, the witness is not asked to view an unknown suspect (or suspects) and

---

[10] In affirming our decision in *Greene*, our Supreme Court (then the Court of Appeals of Maryland) explained that it was also fully embracing this Court's analysis. *See* 469 Md. at 172-73 & n.9.

At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See also* Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland[.]").

[11] For example, in *Neil*, the U.S. Supreme Court described a "showup" procedure in which, because of difficulties in finding suspects that matched a witness's description, police brought a single suspect before the witness for identification. *Neil v. Biggers*, 409 U.S. 188, 194-95 (1972). The witness did not have any previous experience with the perpetrator of the crime in question, and the purpose of the showup was to select and identify that perpetrator to law enforcement. The showup procedure occurred after a series of other selective identification procedures in which the same witness viewed other suspects in lineups, showups, and photographs, without identifying any of those other suspects as the perpetrator. *Id.* at 194-95.

13

select the wrongdoer. Instead, the witness is merely asked to confirm that a suspect shown to the witness is the person the witness knew from before the crime. Only a witness who is familiar with the suspect can make a confirmatory identification. *Greene*, 469 Md. at 173-74. This type of identification can occur, for example, where "a witness identifies someone he or she knows from before but cannot identify by name[,]" and police "display a single photograph to [the] witness in an effort to confirm the identity of [the] perpetrator." *Greene*, 240 Md. App. at 134 (quoting *State v. Pressley*, 181 A.3d 1017, 1020 (N.J. 2018)).

Often, a confirmatory identification involves a non-eyewitness—that is, a person who did not witness the crime firsthand. *See Greene*, 469 Md. at 157-58. As such, several of our decisions have discussed confirmatory identifications made by non-eyewitnesses. *E.g.*, *Greene*, 240 Md. App. at 125 (non-eyewitness identification of a suspect from viewing video footage after a crime occurred); *Myers v. State*, 243 Md. App. 154, 175 (2019) (same). Our decisions, however, and the persuasive authorities informing those decisions, have also recognized that an *eyewitness* can make a confirmatory identification as well. *See, e.g.*, *Greene*, 240 Md. App. at 133 (a single-photograph identification can be "merely confirmatory, based on the eyewitnesses' prior familiarity with the defendant[.]") (quoting *People v. Jenkins*, 230 A.D.2d 806, 807 (N.Y. App. Div. 1996)). Indeed, years before we issued our opinion in *Greene*, this Court cited jurisprudence from several different jurisdictions to note exactly that: "when an eyewitness tells an officer shortly after the crime that he or she knows the defendant and has seen him around[,]"

14

courts "generally hold" that the identification is confirmatory. *Simons v. State*, 159 Md. App. 562, 572 n.1 (2004) (citing cases).

Put simply, the difference between selective and confirmatory identifications does not stem from whether the identification involves an eyewitness (or not); it stems from constitutional concerns arising from identifying an unknown perpetrator. Recently, in *Greene*, we explained these concerns in detail and traced their historical development in the U.S. Supreme Court. *See* 240 Md. App. at 135-44. Rather than repeat that discussion here, we will instead draw from it in discussing the distinction between selective and confirmatory identifications.

In the typical selective identification, the witness does not know the suspect from before the crime, and the witness must select and identify the perpetrator based only upon a memory of that person's characteristics. That memory stems entirely from the crime itself, which poses particular risks because the witness might "have obtained only a brief glimpse of the criminal[] or may have seen [the criminal] under poor conditions." *Simmons v. United States*, 390 U.S. 377, 383 (1968). An impermissibly suggestive police procedure could influence such a witness into mistakenly identifying an innocent defendant (who merely resembles the perpetrator), thus infringing upon the defendant's due process rights. *Id.* at 384. Impermissible suggestion operates by "giving the witness a clue about which [suspect] the police believe the witness should identify[,]" *Small v. State*, 464 Md. 68, 88 (2019). Or, put differently, by "contaminat[ing] the test by slipping the answer to the testee." *Conyers v. State*, 115 Md. App. 114, 121 (1997) (emphasis omitted).

Particularly when a witness has only a weak memory of the perpetrator, impermissible suggestion may even influence the witness's memory itself—that is, the witness could "retain in his memory the image of the photograph [shown by police] rather than of the person actually seen[.]"*Simmons*, 390 U.S. at 383-84; *see also Manson v. Brathwaite*, 432 U.S. 98, 112 (1977) ("Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness['s] recollection of the stranger can be distorted easily by the circumstances or by later actions of the police.").[12]

The U.S. Supreme Court has acknowledged these risks, while at the same time recognizing that there are "serious drawbacks" to suppressing *all* identifications involving impermissible suggestion. *Manson*, 432 U.S. at 112. Specifically, such an exclusionary approach would "den[y] the trier reliable evidence, it may result, on occasion, in the guilty going free. . . . [and it] may make error by the trial judge more likely[.]" *Id.* The Supreme Court thus adopted constitutional "reliability" as the ultimate criterion, *see id.* at 114, a criterion that is satisfied so long as any impermissible suggestion does not "give rise to a very substantial likelihood of irreparable

---

[12] There are other risks as well, particularly in the context of violent crime. In such a case, the "victim's understandable outrage may excite vengeful or spiteful motives." *United States v. Wade*, 388 U.S. 218, 230 (1967). That is, a witness who is also a victim could adopt the motive that someone must answer for the crime and select the person who appears to be the subject of the police investigation.

16

misidentification[,]"[13] *see Simmons*, 390 U.S. at 384.

Accordingly, the constitutional due process analysis proceeds in two steps. *First*, a court must assess whether an impermissibly suggestive procedure, arranged by a state actor, procured the identification. *See Bean*, 240 Md. App. at 345 (citing *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012)). *Second*, the court must determine whether, because of that impermissible suggestion, the identification is not constitutionally "reliable"—i.e., whether the identification presents "a very substantial likelihood of irreparable misidentification."[14] *See Manson*, 432 U.S. at 110, 114; *Simmons*, 390 U.S. at

---

[13] The U.S. Supreme Court has clarified that "reliability" in this context does not refer to factual reliability. *Manson*, 432 U.S. at 112 (identifications need only be supported by certain "aspects of reliability" to reach a jury); *see also Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant . . . a trial court to screen the evidence for reliability . . . . the jury, not the judge, traditionally determines the reliability of evidence."). As such, unless there is a very substantial likelihood of irreparable misidentification (caused by impermissible suggestion), it is the *factfinder's* responsibility to determine how reliable, in a factual sense, the identification is under the circumstances, and what weight to give it.

[14] At suppression hearings in Maryland, the parties have the following burdens of proof as the analysis proceeds. "First, the defendant bears the burden of demonstrating 'some unnecessary suggestiveness in the procedures employed by police.'" *Bean*, 240 Md. App. at 355 (quoting *Thomas v. State*, 213 Md. App. 388 (2013)). Next, "[i]f the procedure is impermissibly suggestive, . . . the burden shifts to the State to prove, by clear and convincing evidence, that the independent reliability in the identification outweighs the corrupting effect of the suggestive procedure." *Bean*, 240 Md. App. at 355 (quotations omitted).

Nevertheless, we have explained that the two-step analysis is skewed heavily in favor of admission: the U.S. Supreme Court has suppressed "an impermissibly suggestive identification on only a single occasion." *See Greene*, 240 Md. App. at 140-41 (citing *Foster v. California*, 394 U.S. 440, 443 (1969)).

17

384. The Supreme Court also articulated several factors to aid in assessing reliability. Each of these factors arises in the usual context of a selective identification, in which a witness must select and identify a stranger after a crime:

> The factors to be considered . . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson*, 432 U.S. at 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

In sum, the Supreme Court's constitutional due process analysis addresses the particular risks that impermissible suggestion can create during the identification of an unknown perpetrator after a crime. That analysis accommodates several different concerns, including protecting the due process rights of the defendant, deterring police misconduct, and allowing the factfinder to hear and weigh identification evidence that is reliable enough from a constitutional perspective. *See Greene*, 240 Md. App. at 139 ("A jury, the Supreme Court pointed out, is perfectly capable of weighing the pluses and minuses of [an impermissibly suggestive] identification. That is why mere suggestiveness in and of itself does not call for exclusion.").

In a typical confirmatory identification, however, the risks from impermissible suggestion do not apply to nearly the same extent. *See Greene*, 240 Md. App. at 130. Because a confirmatory identification witness knows the perpetrator from before the crime, his is not the "recollection of [a] *stranger* [that] can be distorted easily by the

18

circumstances or by later actions of the police." *See Manson*, 432 U.S. at 112 (emphasis added). For example, in the eyewitness context, a confirmatory identification eyewitness need only notice that the perpetrator is someone the witness knows, remember that fact long enough to inform police, and perhaps confirm for officers that they are pursuing the correct person (particularly if the eyewitness does not remember much background information about the perpetrator, like the person's full name). In contrast, the selective identification eyewitness must—while a crime is being committed—take in as many descriptive details as possible about a stranger; remember each of those details long enough, and accurately enough, to perform a selective procedure; and then correctly identify the stranger who fits those details (without mistakenly identifying a different stranger who possesses similar characteristics). By its nature then, a selective identification is generally more challenging, tenuous, and vulnerable to suggestion than a confirmatory identification.

Considering those realities, and given all the circumstances here, we conclude that the police employed a confirmatory identification procedure in showing Mr. Reyes's photograph to Mr. Bartley. Although Mr. Bartley was indeed an eyewitness to (and victim of) a crime, he did not perform any selection. Rather than perceiving a stranger and attempting to memorize descriptive details, Mr. Bartley simply recognized Mr. Reyes from before the crime. He then told police as much. Thus, when Mr. Bartley was shown Mr. Reyes's photograph, it was not to help Mr. Bartley select and identify the perpetrator—there was no selection necessary. Showing the photograph was also not a suggestion by police about the identity of the perpetrator, because Mr. Bartley had

19

already told police that "Andy" had shot him. Instead, the photograph was shown as part of a confirmatory process in which police sought to ensure that they were investigating the correct individual: the person Mr. Bartley remembered from before the crime and had already (verbally) identified.

> 2. The circuit court did not err in declining to suppress the confirmatory identification because Mr. Bartley was sufficiently familiar with Mr. Reyes that the identification did not implicate due process concerns

It is not enough to conclude that police here employed a confirmatory procedure. We must also assess whether the resulting confirmatory identification "implicat[ed] due process concerns." *Greene*, 469 Md. at 174. That is, we must assess whether "as a matter of law, the witness is so familiar with the defendant that there is little or no risk that police suggestion could lead to a misidentification."[15] *Greene*, 240 Md. App. at 131 (quoting *People v. Rodriguez*, 593 N.E.2d 268, 272 (N.Y. 1992)) (cleaned up); *see also Simons*, 159 Md. App. at 572 n.1 (the confirmatory identification distinction "is premised on . . . familiarity between the witness and the suspect," which can protect against the effects of any "police suggestion"). In essence, if a confirmatory identification is supported by sufficient familiarity, then it does not implicate due process concerns; it is

---

[15] In analyzing confirmatory identifications, some opinions use the phrase "personal knowledge" to refer to the witness's degree of experience with a suspect from before the crime. *See e.g.*, *People v. Jones*, 175 N.Y.S.3d 413, 420 (N.Y. Sup. Ct. 2022) (Weston, J., dissenting). For clarity, however, we will refer instead to the amount of "familiarity" needed to avoid implicating due process concerns. As we will explain in more detail, a minimal showing of "personal knowledge" under Maryland's rules of evidence, *see* Md. Rule 5-602, will not necessarily combat the effects of impermissible suggestion by the police.

20

automatically considered constitutionally reliable. *See Greene*, 240 Md. App. at 131. If, however, a confirmatory identification is not supported by sufficient familiarity, then it must be analyzed like a selective identification—by assessing impermissible suggestiveness and ultimate constitutional reliability. *See id.*

In describing that distinction and examining its contours, Maryland's appellate courts have often looked to the decisions of other state courts, particularly the decisions of New York's courts. *See, e.g.*, *Greene*, 469 Md. 172-74 & nn. 9-11 (citing cases); *Greene*, 240 Md. App. at 131-34 (same); *Simons*, 159 Md. App. at 572 n.1 (same); *see also Myers*, 243 Md. App. at 165 (explaining that we have "follow[ed] the lead" of New York's courts in "recognizing the analytic distinction between selective identification issues and confirmatory identification issues"). From those persuasive authorities and our own precedents, we distill some basic principles.

To assess whether there is sufficient familiarity to support a confirmatory identification, we look to the whole circumstances. That is, we may consider (among other things) the witness's opportunity to view and interact with the suspect on prior occasions before the crime, as well as the witness's behavior after the crime that might shed light on the witness's prior familiarity with the suspect:

> [T]he court might consider . . . the number of times [the witness] viewed defendant prior to the crime, the duration and nature of the encounters, the setting, the period of time over which the viewings occurred, the time elapsed between the crime and the previous viewings, and whether the two had any conversations. Whether [the witness] told the police prior to being shown defendant's photograph that he recognized the [perpetrator] might also be relevant.

*Rodriguez*, 593 N.E.2d at 272.

There will typically be sufficient familiarity where the suspect is "a family member, former friend or long-time acquaintance of a witness[.]" *Greene*, 240 Md. App. at 132 (quoting *People v. Collins*, 456 N.E.2d 1188, 1191 (N.Y. 1983)). This is because a sufficient "independent source of identification trumps any suggestive taint that officers subsequently use while having the eyewitness identify the defendant at the station through photos or lineups." *Simons*, 159 Md. App. at 572 n.1 (citing cases). Similarly, a prior relationship that "is fleeting or distant[,]" may not allow a witness to withstand impermissible suggestion or allay due process concerns.[16] *See Rodriguez*, 593 N.E.2d at 272 (quotation omitted); *see also Simons*, 159 Md. App. at 572 n.1 (noting that the confirmatory identification distinction "clearly does not apply when the familiarity emanates from a brief encounter.") (quoting *People v. Yara*, No. 9479/00, 2002 WL 31627019, at *4 (N.Y. Sup. Ct. Nov. 6, 2002)).

Ultimately, however, the bar for sufficient familiarity is not high. For example, sufficient familiarity has been found where a witness only knew the suspects at issue for

---

[16] We emphasize that the focus in this analysis is on withstanding a hypothetical suggestion by police—not any cajoling, browbeating, or other pressure placed upon a witness. Such pressure can be addressed in other ways that are not relevant here. *See Greene*, 240 Md. App. at 151-52 ("To do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make.") (quoting *Conyers*, 115 Md. App. at 121 (emphasis omitted). A confirmatory identification need only be supported by enough familiarity that there is little risk that a police *suggestion* would change the identification. It is irrelevant whether the witness held firm (or would be likely to hold firm) under pressure.

22

one month and may not have known their names. *See People v. Tas*, 415 N.E.2d 967, 967-68 (N.Y. 1980) (witness and suspects had been fellow inmates in the same tier of cells). Sufficient familiarity has also been found in a variety of other situations. *See, e.g.*, *Greene*, 240 Md. App. at 124-25 (witness and suspect had been in a romantic relationship for five years that ended less than a year before the identification occurred); *People v. Ross*, 603 N.Y.S.2d 652, 655 (N.Y. Sup. Ct. 1993) (witness knew suspect for approximately three years or longer before the crime, had spoken to him on several occasions, knew his name, and told police that he recognized the suspect before any identification procedure had occurred). Indeed, this Court has noted that there is generally sufficient familiarity "when an eyewitness tells an officer shortly after the crime that he or she knows the [perpetrator] and has seen him around[.]" *Simons*, 159 Md. App. at 572 n.1 (citing cases).

Decisions in which a court has determined that there was *insufficient* familiarity, by contrast, are rare. Nonetheless, at least one court has concluded that the prosecution failed to present sufficient evidence of familiarity at a hearing. *See People v. Bernhard*, 118 A.D.2d 348, 348 (N.Y. App. Div. 1992) (insufficient evidence of familiarity where the only evidence was nonspecific testimony from police officers that the witness said that he "knew defendant from the neighborhood," without more).[17]

---

[17] Additionally, other cases have been remanded for further proceedings when familiarity was unclear and had not been adequately tested through cross-examination at a hearing. *See, e.g.*, *Rodriguez* 593 N.E.2d at 270-72 (remanding to allow further examination into familiarity where a witness had allegedly seen a suspect approximately 50 times as a customer in a grocery store where the witness worked, but where full cross

Bearing those principles and decisional guideposts in mind, we now turn to the facts here, taking the evidence at the suppression hearing in the light most favorable to the prevailing party. Mr. Bartley knew Mr. Reyes for approximately six months before the crime occurred. During that time, he was able to observe Mr. Reyes several times and in a variety of settings, including at Ms. Barahona's house and at a restaurant. Mr. Bartley had enough experience with Mr. Reyes to recognize his voice and to identify him from a photograph. Moreover, Mr. Bartley knew that Mr. Reyes's first name was Andy, and he was able to tell the police after the crime that he knew "Andy" had shot him. He was also able to provide further information, including a restaurant frequented by Mr. Reyes and where the police might obtain Mr. Reyes's photograph—all before the police had any basis to suggest a person who might have committed the crime. This further speaks to Mr. Bartley's familiarity with Mr. Reyes.[18]

---

examination of familiarity had not been allowed); *People v. Williamson*, 588 N.E.2d 68, 69 (N.Y. 1991) (remanding to allow further examination into familiarity where a witness had previously seen the suspect approximately 10 times in the bodega where she worked, and about 20 times in the neighborhood where they lived, but where a hearing was not held to determine familiarity).

[18] Mr. Bartley also had several seconds before the shooting to have a brief conversation with Mr. Reyes under the streetlight. Of course, the quality of a witness's opportunity to observe the perpetrator commit the crime is usually irrelevant in determining whether a confirmatory identification is supported by sufficient familiarity. *See Greene* 240 Md. App. at 125-26, 151 (explaining that a non-eyewitness's lack of complete certainty in an identification, particularly considering the poor quality of a video showing the perpetrator commit the crime, goes to the *weight* of the witness's identification, not issues of suppression; "[w]eight, of course, is classic grist for the jury mill"). Here, however, the last-minute interaction between Mr. Bartley and Mr. Reyes supports sufficient familiarity because it was yet another opportunity for Mr. Bartley to observe Mr. Reyes (and to hear Mr. Reyes's voice) before the crime occurred.

Indeed, the police only became aware of Mr. Reyes at the urging of Mr. Bartley himself. This was because of Mr. Bartley's independent identification of the shooter, based upon prior familiarity. The purpose of showing Mr. Bartley a photograph of Mr. Reyes was also not to select a suspect; it was simply to confirm to police that they were pursuing the correct suspect Mr. Bartley had independently identified. We perceive no clear error in the circuit court's factual findings. And given these findings, Mr. Bartley's familiarity with Mr. Reyes was legally sufficient to resolve any due process concerns stemming from impermissible suggestion. That is, as a matter of law, Mr. Bartley was so familiar with Mr. Reyes that there was little or no risk that police suggestion could lead to a misidentification.

Having so held, we need not address the circuit court's additional conclusion that it was impermissibly suggestive to display a single photograph of Mr. Reyes to Mr. Bartley, without any other photographs as part of an array. After reviewing the evidence at the suppression hearing, the circuit court found that Mr. Bartley knew Mr. Reyes before the shooting. Accordingly, the circuit court held that Mr. Bartley's identification of Mr. Reyes was constitutionally reliable. We agree with that ultimate holding. We also note that a confirmatory identification supported by sufficient familiarity (as it was here)

---

Nonetheless, we emphasize that the inquiry at a suppression hearing is limited to (1) whether the confirmatory identification was supported by sufficient familiarity, and if not, then (2) whether the identification should nonetheless be admitted as a selective identification. Other issues are for the jury, including the ultimate weight to be given to the identification itself, as well as the witness's credibility and reliability with respect to the identification (rather than the witness's prior familiarity with the suspect).

25

will always be constitutionally reliable, because sufficient familiarity counters the effects of impermissible suggestion. That is part of the justification for distinguishing between confirmatory and selective identifications in the due process analysis. And it is also why police suggestion is irrelevant when a confirmatory identification witness is sufficiently familiar with a suspect.[19] *See Myers*, 243 Md. App. at 165 ("[Notwithstanding] the analytic distinction between selective identification issues and confirmatory identification issues, the controlling criterion remain[s] the reliability of the confirmatory identification."). Even though the circuit court went further than necessary, it was correct to deny Mr. Reyes's motion to suppress his identification by Mr. Bartley.

### B. The Evidentiary Issues

1. The circuit court did not abuse its discretion when it admitted photographic evidence captured on a home security camera

Mr. Reyes next contends the circuit court erred when it admitted video surveillance footage of the shooting and photographic stills derived from the footage captured on Mr. Stevvings's home security camera. He asserts that additional testimony

---

[19] We explained as much in *Greene*. After holding that the identification at issue was confirmatory and did not implicate due process concerns, we also performed a separate selective identification analysis to show how that identification satisfied due process requirements. *See* 240 Md. App. at 145-55. And in affirming our decision, the Supreme Court of Maryland did the same. *See* 469 Md. at 173 n.9 (explaining that, because of the witness's longstanding familiarity with the suspect, "even if one were to assume that . . . [police] conduct was impermissibly suggestive, those assumptions would not require suppression . . . . The identification . . . would survive at the second, ultimate step of the [constitutional] analysis because the identification was reliable") (cleaned up). As such, we reiterate that when a confirmatory identification is supported by sufficient familiarity, courts need not perform a full selective identification analysis.

26

was necessary to properly authenticate this evidence, including testimony as to the make and model of the camera, how many times the camera activated on the night of the shooting, how long the camera records once activated, whether the camera was in need of maintenance, and whether the video footage was modified to send it via email. Therefore, he argues, testimony supporting the video footage did not satisfy the applicable authentication requirements. We disagree.

The process of authentication refers to "laying a foundation" to admit "nontestimonial evidence [such] as documents and objects" sufficient to establish "a connection between the evidence offered and the relevant facts of the case." *Jackson v. State*, 460 Md. 107, 115-16 (2018) (citation omitted). The standard for admissibility is low: the court "need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so." *Id.* (citations omitted) (emphasis in the original). A "videotape is considered a photograph for admissibility purposes[,]" and both videotapes and photographs are "subject to the same general rules of admissibility[.]" *Washington v. State*, 406 Md. 642, 651 (2008). As such, all photographic evidence, including video evidence, may be authenticated under several theories, including the "pictorial testimony" theory and the "silent witness" theory. *Id.* at 652; *see also* Md. Rule 5-901(b)(4) & (9) (setting forth examples of permitted authentication methods, including, respectively, "[c]ircumstantial evidence . . . that the offered evidence is what it is claimed to be" and "[e]vidence describing a process or system used to produce the proffered exhibit or testimony and showing that the process or system produces an accurate result").

27

Under the "pictorial testimony" theory, photographic evidence is admissible "to illustrate testimony of a witness when that witness testifies from first-hand knowledge that the [evidence] fairly and accurately represents the scene or object it purports to depict as it existed at the relevant time." *Washington*, 406 Md. at 652; *see also* Md. Rule 5-901(b)(4). This theory allows for authentication of the evidence through testimony that demonstrates the witness's personal knowledge of what is depicted.

If, however, photographic evidence is recorded on equipment that operates automatically, it may be authenticated under the "silent witness" theory instead. Under that theory, photographic evidence operates "as a mute or silent independent photographic witness" that speaks with its own probative effect. *Washington*, 406 Md. at 652-53. Thus, authenticating video surveillance footage under the "silent witness" theory focuses more on "assuring the accuracy of the process producing it[.]" *Id.* at 653 (quotation omitted); *see also* Md. Rule 5-901(b)(9). Testimony under this theory may include the "type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system." *Jackson*, 460 Md. at 117 (citation omitted).

Here, Mr. Stevvings identified the camera that recorded the video footage as a Wi-Fi-enabled home security camera that he had installed in the front window of the house he shared with his grandparents. He further testified to the "general reliability" of the camera and explained how the camera would send an alert to his phone when it began recording. He said that he received such an alert the night of the shooting when the camera recorded the movements of Mr. Bartley and Mr. Reyes. To be sure, Mr. Stevvings

28

did not testify, among other things, to the maintenance schedule of his camera, its precise make and model, or its exact recording duration. Nonetheless, there was still sufficient evidence for the jury to conclude that the footage was what the State claimed it to be, particularly considering that Mr. Stevvings testified to the camera's reliability, its process for automatically recording footage and sending alerts, and his receipt of an alert on the night of the shooting. We hold that Mr. Stevvings's testimony about the footage provided an "adequate foundation assuring the accuracy of the process producing it," and as such, the evidence was properly "received as a so-called silent witness[.]" *Washington*, 406 Md. at 653 (quotation omitted).

As to the photographic stills derived from that video footage, our analysis is the same. On appeal, Mr. Reyes raises the issue of authentication as to both the video surveillance and photographic stills, but he focuses predominantly on the video footage (and on Mr. Stevvings's testimony supporting that footage). Likewise, Mr. Reyes's objection at trial to the photographic stills was entirely predicated on, and derived from, his earlier objection to the video; he did not raise a different objection to the stills.[20] For

---

[20] In full, Mr. Reyes explained his objection to the photographic stills as follows:

> [COUNSEL FOR MR. REYES]: Thank you, Your Honor.
> For the purpose of the record and to be clear . . . I objected
> yesterday to the admission of the surveillance video and I
> argued that it was not properly authenticated. These pictures
> are stills of the same video. So the same objection applies in
> terms of - - I would assert that if the video had not been
> admitted, then the stills also would not have been admitted for
> the same reason . . . I have to object to the admission of
> evidence that is derived from evidence that I have already

29

those reasons, and because photographs and videos are generally subject to the same authentication analysis, we further hold that Mr. Stevvings's testimony provided a sufficient foundation for authenticating the photographic stills under the "silent witness" theory. *See also Washington v. State*, 406 Md. at 653-55 ("Authentication of a photograph does not require testimony of the person who took the photograph.").[21]

2. The circuit court did not abuse its discretion when it limited certain cross-examination of Mr. Bartley

Mr. Reyes's final contention is that the circuit court erred by limiting his cross-examination of Mr. Bartley. Specifically, Mr. Reyes asserts that he should have been allowed to explore Mr. Bartley's history of domestic violence toward Ms. Barahona, including a second-degree assault conviction, an alleged altercation, alleged threats to Ms. Barahona, and a request by Ms. Barahona that Mr. Bartley not visit her home. Mr. Reyes also asserts that he should have been allowed to explore several "inconsistencies" related to Mr. Bartley's testimony. These, he contends, include that Mr. Bartley provided

---

previously objected to and the [court] overruled my objection. And again . . . the State failed to lay the proper foundation for authentication. Thank you.

[21] Mr. Stevvings's grandmother further testified that the security camera had been installed on the house that she shared with Mr. Stevvings, and that it was installed approximately two years before the shooting. Although her testimony did not add much information about the camera, it was consistent with Mr. Stevvings's testimony and further supports that the camera was installed before the night of the shooting. Thus, because we hold that the photographic evidence at issue here was properly authenticated under the "silent witness" theory, we do not reach the State's alternative argument that Mr. Bartley's testimony was sufficient to authenticate the photographic evidence under the "pictorial testimony" theory.

an incorrect phone password to Detective Davis and that Mr. Bartley had previously stated that he was meeting Ms. Barahona to buy marijuana.

Mr. Reyes raises several arguments in support of those desired lines of questioning, asserting that the questioning was necessary to generate a defense of others instruction, to rebut the State's suggestion that Mr. Bartley was a "peaceful" victim, and to suggest a motive for Mr. Bartley to falsely accuse Mr. Reyes. As to the alleged inconsistencies, he also argues more broadly that he should have been allowed to put inconsistencies related to Mr. Bartley's testimony before the jury and to explore topics that were put at issue by the State on Mr. Bartley's direct examination. We disagree, however, that the circuit court abused its discretion in how it limited Mr. Bartley's cross-examination.

"Evidence admitted at trial must be relevant, and its danger of unfair prejudice may not substantially outweigh its probative value." *Williams v. State*, 215 Md. App. 523, 560 (2021) (citing Md. Rules 5-402 & 5-403). Further, even if relevant, character evidence is generally "not admissible to prove that the person acted in accordance with the character or trait on a particular occasion." Md. Rule 5-404(a)(1). Although an accused may offer evidence of the victim's "pertinent trait of character[,]" Md. Rule 5-404(a)(2)(B), how such character evidence is admitted depends on its importance. Where the trait is "an essential element of a charge, claim, or defense[,]" the accused may attempt to prove the trait by offering proof of reputation, opinion, or relevant specific instances of conduct. *See* Md. Rule 5-405.

Additionally, an opponent may render otherwise irrelevant evidence, including

31

specific instances of conduct, relevant by "opening the door" to it. This can occur when "competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue." *Clark v. State*, 332 Md. 77, 85 (1993). This doctrine is "based on principles of fairness and serves to balance any unfair prejudice one party may have suffered. . . .[by] introduc[ing] otherwise inadmissible evidence [] in response to evidence put forth by the opposing side." *State v. Robertson*, 463 Md. 342, 351-52 (2019) (cleaned up); *see also id.* at 360 (defense counsel's use of the term "any" expanded the scope of questioning, opening the door for the State "to introduce evidence to rebut the image of [the defendant] as an upstanding individual who had never been in any trouble") (citing Md. Rules 5-404 & 5-608).

Evidence, including specific instances of conduct, may also be relevant for impeachment. *See* Md. Rule 5-611(b) (cross-examination "should be limited to . . . the direct examination and matters affecting the credibility of the witness"). Maryland Rule 5-616 provides a non-exhaustive list of ways to impeach a witness, either by inquiry of the witness himself ("intrinsic impeachment" per Rule 5-616(a)) or by admission of "extrinsic impeaching evidence" per Rule 5-616(b). For the former, a witness may be questioned about prior conduct not resulting in a conviction or questions designed to prove that the witness "has a motive to testify falsely[,]" among other things. *See* Md. Rule 5-616(a)(4) & (6).

To be sure, to ensure the defendant's right of confrontation, the defense must be given "wide latitude to cross-examine a witness as to bias or prejudices." *Martinez v. State*, 416 Md. 418, 428 (2010). But the right to cross examination is not without limit.

Questions about a witness's potential bias or prejudice may be prohibited "if (1) there is no factual foundation for such an inquiry in the presence of the jury; or (2) the probative value of such an inquiry is substantially outweighed by the danger of undue prejudice or confusion." *Calloway v. State*, 414 Md. 616, 638 (2010) (cleaned up). "Otherwise, the inquiry can reduce itself to discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion." *Pantazes v. State*, 376 Md. 661, 680-681 (2003) (quotations omitted). As such, "[w]hen a defendant wants to cross-examine a State's witness to show bias or motive, 'the crux of the inquiry insofar as relevance is concerned, is the witness's state of mind.'" *Martinez v. State*, 416 Md. at 431 (2010) (quoting *Smallwood v. State*, 320 Md. 300, 309 (1990)). A witness's motivation to testify falsely can be shown by circumstantial evidence, including, for example, evidence that the witness is testifying in exchange for leniency, early release from custody, or the State's decision to dismiss or forego charges. *See Manchame-Guerra v. State*, 457 Md. 300, 316-17 (2018) (citing cases); *Calloway v. State*, 414 Md. at 638.

Bearing these principles in mind, we now turn to the facts here. Regardless of whether Mr. Reyes sought to question Mr. Bartley about his history of domestic violence against Ms. Barahona to secure a defense of others instruction, to rebut the State's characterization of Mr. Bartley as a "peaceful" victim, or simply to impeach Mr. Bartley and suggest a motive for him to lie, we see no avenue for appellate relief. We explain.

As to Mr. Reyes's first argument, concerning a defense of others instruction, from our review of the record, there appears to be no evidence that Mr. Reyes actually believed that Ms. Barahona was in "immediate" or "imminent" danger from Mr. Bartley at the

33

time of the shooting. Nor could there have been. As the circuit court recognized, Mr.

Bartley's alleged assault of Ms. Barahona occurred at least "several hours before" the

shooting, and "too much time had elapsed" for Mr. Reyes to claim that Mr. Bartley then

posed an immediate or imminent danger to Ms. Barahona. Indeed, Ms. Barahona was not

present at the shooting.[22] "A common thread running through the cases in which the

defense of others has been recognized or an instruction . . . [has been] generated by the

evidence is that the person being defended was coming under direct attack when the

defendant came to his or her defense." *Lee v. State*, 193 Md. App. 45, 64 (2010). Without

such evidence, any danger that Mr. Bartley may have posed to Ms. Barahona in the past

was, as the circuit court recognized, no more than irrelevant (and inadmissible)

propensity evidence.

Next, even if we were to reach Mr. Reyes's contention that the State "opened the

door,"[23] we conclude that the mention of a "church" did not open the door to evidence

---

[22] For that same reason, it is also of no moment whether Mr. Bartley sought to meet with Ms. Barahona to retrieve a "knife" in her possession: Ms. Barahona's absence from the scene of the shooting precludes a defense of others instruction.

[23] We agree with the State that this argument is not preserved. Mr. Reyes claims that Mr. Bartley's testimony about meeting at a church served to open the door, but this testimony came *after* the circuit court had excluded propensity evidence of Mr. Bartley's violent character as irrelevant, and invited counsel to revisit that ruling (or move for reconsideration) if the evidence later became admissible. Mr. Reyes, however, never again attempted to question Mr. Bartley about any propensity for violence—even after Mr. Bartley's testimony about meeting at the church—nor did he again raise the issue in the circuit court. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]").

about Mr. Bartley's propensity for violence. As used by Mr. Bartley, "church" was simply an agreed meeting place, not any indication of a peaceful character. Mr. Bartley never suggested, for instance, that the meeting place had any special significance beyond that of a landmark, nor did he suggest that he had attended church in the past, or even that he intended to enter the church as part of the meeting. In short, the mere reference to the church as an agreed meeting place was not intended to (and did not) paint Mr. Bartley as a peaceful victim, so the door was not opened.

Nor do we see any abuse of discretion in the circuit court's exclusion of Mr. Bartley's history of violence against Ms. Barahona, including her request that he not visit her home, as impeachment evidence. Acts of violence "generally have little or no direct bearing on honesty and veracity." *Ricketts v. State*, 291 Md. 701, 705 (1981). And here, Mr. Reyes proffered no basis for why Mr. Bartley's alleged violence toward Ms. Barahona would reveal anything about Mr. Bartley's credibility generally, or about why it would have motivated Mr. Bartley to lie that Mr. Reyes was the shooter:

> [COUNSEL FOR MR. REYES]: He told Detective Davis that Emily set him up.
>
> [THE COURT]: That is different than Emily shot him.
>
> [COUNSEL FOR MR. REYES]: I --
>
> [THE COURT]: So I am not sure I follow your logic.
>
> [COUNSEL FOR MR. REYES]: Again, it is cross examination. I have the right to cross examine the witness for a variety of things. Not the least is which is why he would blame my client. So if the Court is telling me that I cannot cross examine Mr. Bartley to understand why he would falsely claim that my client did this, then you know, I would strongly object to that.

35

[THE COURT]: Well, I am going to sustain the objection to that question.

In other words, even if Mr. Bartley had been violent toward Ms. Barahona, and even if he believed that Ms. Barahona "had set him up," Mr. Reyes offered no evidence (or explanation) as to how this would have motivated Mr. Bartley to implicate Mr. Reyes falsely or been admissible for some other permitted purpose. Accordingly, we do not disturb the circuit court's decision to exclude evidence of Mr. Bartley's alleged violence toward Ms. Barahona as impeachment evidence.[24]

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

[24] As to the remainder of his desired lines of questioning, including that Mr. Bartley provided an incorrect phone password to Detective Davis and that Mr. Bartley previously stated that he sought to buy marijuana from Ms. Barahona, the issue is not preserved. Mr. Reyes did not offer any of these lines of questioning for the circuit court's consideration, much less explain their relevance or factual foundation. On appeal, he points only to broad, nonspecific arguments made before the circuit court, including "it is cross examination. I have the right to cross examine the witness for a variety of things." That, however, is insufficient. *See Peterson*, 444 Md. at 125.

Moreover, even if we were to assume that these arguments were preserved, Mr. Reyes also does not explain on appeal how they are relevant, except to argue that he should have been allowed to explore any inconsistencies in Mr. Bartley's testimony. The State did not open the door to that questioning and "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant." *Marshall v. State*, 346 Md. 186, 195 (1997) (quotations omitted). The circuit court did not abuse its discretion in so limiting the cross-examination of Mr. Bartley.